## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION, <br><br> Plaintiff, <br><br> v. <br><br> BENJAMIN TAYLOR, DARINA WINDSOR, and JOSEPH ABDUL NOOR EL-KHOURI, <br><br> Defendants. | Civil Action No. _____ <br><br> **JURY TRIAL DEMANDED** |

## COMPLAINT

Plaintiff United States Securities and Exchange Commission ("the Commission"), for its Complaint against Defendants Benjamin Taylor ("Taylor"), Darina Windsor ("Windsor"), and Joseph Abdul Noor El-Khouri ("El-Khouri") alleges as follows:

### SUMMARY OF THE ACTION

1.     Between at least January 2013 and at least August 2015, while working as investment bankers in London, England, Taylor and Windsor participated in an international insider trading scheme that netted its participants tens of millions of dollars in illicit profits from trading in the securities of U.S. companies.  During that period, while engaged in a romantic relationship, Taylor and Windsor carried out the scheme by misappropriating from their respective employers material nonpublic information concerning impending corporate transactions (such as mergers, acquisitions, and tender offers), directly or indirectly tipping such commercially sensitive information to other individuals who used it to trade securities, and sharing in the resulting proceeds of the illegal securities transactions.  El-Khouri was one of the individuals who received and profitably traded on the basis of material nonpublic information

tipped by Taylor and Windsor.

2.     Beginning in at least January 2013, Taylor obtained material nonpublic information about corporate transactions from the investment bank at which he was employed ("Investment Bank 1") and on more than one occasion directly or indirectly tipped this information to an individual residing in Switzerland ("Trader A") for use in trading securities.

3.     Beginning in at least February 2013, Taylor directly or indirectly tipped Trader A similar material nonpublic information that Taylor obtained from his girlfriend Windsor, who worked at a different investment bank ("Investment Bank 2").

4.     Beginning in at least March 2015, Taylor also directly or indirectly tipped to El-Khouri the information that Taylor received from Windsor.

5.     In providing these tips, Taylor and/or Windsor disregarded Investment Bank 1's and Investment Bank 2's internal policies, which dictated that information related to corporate transactions must be kept confidential.  Windsor provided the information to Taylor with the knowledge that he would tip the information to others who would use it to trade securities and/or further tip the information to others who would place the trades.

6.     Based on the tips that Windsor and Taylor provided, El-Khouri realized over $2 million in illicit gains from trading the securities of at least six different public companies—Pharmacyclics Inc., Hyperion Therapeutics, Inc., Receptos Inc., Omnicare, Inc., Solera Holdings, Inc., and EnerSys Inc.—in advance of news that these companies had been targeted for acquisition in contemplated or agreed upon corporate deals.  At all relevant times, each company's common stock was registered with the Commission under Section 12(b) of the Exchange Act.  At all relevant times, the securities of each company traded on United States securities exchanges, including the New York Stock Exchange ("NYSE") and the NASDAQ Stock Market ("NASDAQ").  Both NYSE and NASDAQ are located in New York, New York.

7.      Taylor and Windsor expected to, and in fact did, receive, directly or indirectly from El-Khouri and Trader A, cash and other benefits in exchange for the insider tips they provided.

8.      By knowingly or recklessly engaging in the conduct described in this Complaint, Defendants violated, and unless restrained and enjoined will continue to violate, Sections 10(b) and 14(e) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78j(b), 78n(e)] and Rules 10b-5 and 14e-3 thereunder [17 C.F.R. §§ 240.10b-5, 240.14e-3].

## NATURE OF PROCEEDING AND RELIEF SOUGHT

9.      The Commission brings this action under Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)].  The Commission seeks permanent injunctions against the Defendants, to enjoin them from engaging in the transactions, acts, practices, and courses of business alleged in this Complaint; disgorgement of profits realized from the unlawful insider trading set forth herein; and civil monetary penalties pursuant to Section 21A of the Exchange Act [15 U.S.C. § 78u-1], and for such other relief as the Court may deem just and appropriate.

## JURISDICTION AND VENUE

10.      This Court has jurisdiction over this action under Sections 21(d), 21(e), 21A, and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), 78u-1, and 78aa].  Certain of the acts, practices, transactions, and courses of business constituting the violations made use of a means or instrumentality of interstate commerce, or of the mails, and/or of the facilities of national securities exchanges.

11.      Venue in this District is proper under Section 27 of the Exchange Act [15 U.S.C. § 78aa], because certain of the acts, practices, transactions, and courses of business constituting the violations alleged in this Complaint occurred in the Southern District of New York.

**DEFENDANTS**

12.     **Taylor**, age 35, resides in France.  Between approximately February 2010 and May 2014, Taylor worked in the London office of Investment Bank 1, whose global headquarters are in New York City.  Taylor worked for other investment banks before and after his employment with Investment Bank 1.

13.     **Windsor**, age 32, is a native of Thailand who resided in London from approximately 2010 to 2016 and currently resides in Thailand.  Windsor worked at Investment Bank 1 from July 2010 through September 2012, where she met Taylor.  From September 2012 through January 2016, Windsor worked as an investment banker at the London office of Investment Bank 2, whose global headquarters are in New York City.

14.     **El-Khouri**, age 52, is a Lebanese national who resides in Monaco and in London. During the relevant time, El-Khouri had accounts at brokerage firms in London, England.

**FACTUAL ALLEGATIONS**

A.     <u>**Taylor's and Windsor's Access to Material Nonpublic Information and Duties to Maintain Confidentiality**</u>

15.     In or about 2010, Taylor and Windsor met while working together at Investment Bank 1 in London, England.  Both Taylor and Windsor worked on deal teams advising bank clients on confidential corporate transactions, including transactions involving publicly traded U.S. companies.

16.     In or about September 2012, Windsor left Investment Bank 1 and began working in a similar capacity in the London office of Investment Bank 2.

17.     Thereafter, Taylor and Windsor continued to communicate and socialize frequently via email, telephone, and in person.  For most (if not all) of the relevant time period, they also lived together.

18.     Taylor knew that Windsor had access to confidential and commercially sensitive information about publicly traded companies through her employment at Investment Bank 2, just as Taylor had access to such information through his employment at Investment Bank 1.

19.     In connection with their employment at the respective banks, both Taylor and Windsor were subject to specific policies and procedures aimed at ensuring the confidentiality of nonpublic information and avoiding the misuse of such information for personal gain through securities trading or other means.  As set forth below, Taylor and Windsor repeatedly violated these policies.

**B.     Overview of the Insider Trading Scheme(s)**

20.     By at least early 2013, if not earlier, Taylor and Windsor participated in a fraudulent scheme to tip material nonpublic information to Trader A for trading purposes.

21.     Taylor and Windsor participated in the scheme because they expected to receive a share of the profits.  Indeed, in February or March 2013, shortly after the scheme began, Windsor created an excel file, entitled Popsy (her pet name for Taylor), that detailed how the profit would be split from an expected investment:

|        | USD       |     | GBP    |     |
|--------|-----------|-----|--------|-----|
| Amount | 2,000,000 |     |        |     |
| %      | 20.0%     |     |        |     |
|        |           |     |        |     |
| Profit | 400,000   |     |        |     |
| Swiss  | 200,000   | 50% |        |     |
| Mine   | 100,000   | 50% | 66,667 | 1.5 |
|        |           | 100 |        | 50  |
| Note   | 1000      |     | 1,333  |     |

22.     Among other things, the spreadsheet calculates the amount of specific US and British currency, in denominations of hundred dollar bills and 50 pound notes respectively, required to make the requisite cash payment of Windsor's share of the trading proceeds.

23.     Taylor and Windsor in fact received substantial cash payments and other benefits (such as watches, clothing, other luxury items, and travel) in exchange for the insider trading tips to Trader A.

24.     Starting in at least early 2015, Taylor and Windsor similarly participated in a fraudulent scheme to directly or indirectly tip material nonpublic information to El-Khouri for trading purposes and a share of the profits, which they in fact received in the form of cash and other payments.

25.     To obtain the information supplied to Trader A and El-Khouri, Windsor and Taylor repeatedly accessed internal electronic files of their respective employers, including files for deals on which they were not staffed and for which they had no business reason to review.

26.     Based on the material nonpublic information that Taylor and Windsor directly or indirectly provided, Trader A and El-Khouri generated substantial profits purchasing the securities of companies that had been targeted for acquisition in advance of such inside information being disclosed to the public.

27.     Trader A and El-Khouri established "long" positions in companies that were targeted for acquisition by purchasing shares of common stock, options and other derivative financial instruments known as contracts-for-difference ("CFDs") and/or spread bets.  CFDs and spread bets are not traded in the United States, but are traded based on securities listed on U.S. exchanges, including NYSE and NASDAQ.

28.     A CFD is an agreement between two parties to exchange the difference in value of an underlying stock between the time the contract is opened and the time at which it is closed. If the share price of the underlying stock increases, the seller pays the difference to the buyer; however, if the share price declines, the buyer must pay the seller.  A CFD thus mirrors the movement and pricing of its underlying stock on a dollar-for-dollar basis, such that any

fluctuation in the market price of the underlying security is reflected in the unrealized gain or loss of the CFD position.  The purchase and sale prices of CFDs are identical to the prices quoted for the shares on the public exchange on which the underlying common stock is listed.

29.     An equity CFD purchaser typically initiates a long position in the same manner in which he or she would purchase common stock, by submitting an order with a CFD provider to buy a certain number of CFDs in a particular stock.  The provider ordinarily purchases the corresponding number of the underlying share to hedge its position and writes the CFDs to the client at the same price.  As with stock transactions, the buyer is able to enter market, limit or stop loss orders when initiating CFD positions.

30.     Spread bets are another form of leveraged financial instrument that enable investors to wager on the price movement of an underlying security, such as the common stock of U.S. listed companies.  In the United Kingdom, spread bet contracts may be purchased in increments of a particular number of "pounds per point," meaning that the purchaser profits that number of British pounds for each one cent price change in the underlying security.  As with CFDs, the profit or loss associated with spread bet contracts, after deducting the costs and fees charged by the firm, depend entirely on the price of the underlying stock as reflected in trades on the national securities exchanges in the United States.

31.     As set forth below, Trader A and El-Khouri purchased CFDs and/or made spread bets on U.S. companies through foreign brokerage firms.  These firms hedged their exposure by purchasing shares of the underlying companies on U.S. exchanges through domestic brokerage firms, or purchasing CFDs or spread bets through other foreign brokerage firms, which in turn purchased the shares of the underlying companies on U.S. exchanges through domestic brokerage firms.

C.     **Taylor Directly or Indirectly Tipped Trader A About Deals Advised by Investment Bank 1**

32.     On multiple occasions beginning in or about January 2013, Taylor directly or indirectly provided material nonpublic information to Trader A concerning deals advised by his then-employer, Investment Bank 1.

33.     For example, in or about January 2013, Taylor directly or indirectly tipped Trader A about the potential corporate acquisition of Life Technologies Corporation, a biomedical laboratory equipment maker based in Carlsbad, California.  Life Technologies common stock traded on the NASDAQ under the ticker symbol LIFE, and its options traded on various stock options markets in the United States.

34.     In or about April 2011, Life Technologies executed a multi-year confidentiality agreement with Investment Bank 1.  Among other things, Investment Bank 1 was involved in the process for evaluating the company's strategic alternatives.  Investment Bank 1 was formally retained as a financial adviser to Life Technologies in or about October 2012.

35.     Around November 10, 2012, the review of potential strategic alternatives was assigned the code name "Project Liberty" to maintain its confidentiality.  Life Technologies and Investment Bank 1 also utilized other procedures to safeguard the confidentiality of Project Liberty, including requiring potential buyers of Life Technologies to sign confidentiality agreements.

36.     During November and December 2012, Life Technologies' investment bankers, including Investment Bank 1, contacted potential buyers.  By the end of December 2012, six potential buyers signed confidentiality agreements with the company in order engage in further discussions regarding a potential transaction.

37.     On January 1, 2013, these six potential acquirers were granted access to an online data room to facilitate the confidential review of key documents and information regarding Life Technologies.

38.     Between at least January 7 and January 11, 2013, Taylor electronically accessed dozens of internal documents relating to Project Liberty and Investment Bank 1's work for Life Technologies, even though Investment Bank 1 had not assigned Taylor to work on the project. Among other documents, Taylor accessed the Project Liberty data room index, six confidentiality agreements executed by potential buyers, as well as PowerPoint presentations prepared for Life Technologies' management and Board of Directors, which referenced potential acquisition prices and other confidential, nonpublic information.

39.     On or about January 16 and 17, 2013, a Canadian newspaper received confidential documents concerning the potential acquisition of Life Technologies including the Project Liberty data room index, five of the six confidentiality agreements with potential buyers, and select pages from the PowerPoint presentations.  The newspaper received these documents from Trader A, who had obtained the documents directly or indirectly from Taylor.

40.     After the market closed on January 17, 2013, the Canadian newspaper published an article reporting that Life Technologies was engaged in a sale process and had hired financial advisors, including Investment Bank 1, to assist with the process.  Citing "materials seen by the Canadian newspaper" and "documents seen by this newspaper," the article specifically mentioned four of the potential buyers by name and noted that they had signed confidentiality agreements which gave them access to a data room.  The article further disclosed the potential offering price range ($65-$75 per share) that was included in PowerPoint presentations that Taylor had accessed and that were provided to the Canadian newspaper.

41.     The next day, January 18, before the market opened, Life Technologies issued a press release acknowledging in part what the Canadian newspaper had reported – namely, that the board had retained Investment Bank 1 and another firm to assist with an annual strategic review.  Life Technologies' share price jumped in reaction to the news article and the press release, opening at $61.23 on January 18, an increase of $6.26 per share, or about 11%, from the prior day's closing price on January 17.  Volume of trading in the common stock of Life Technologies increased from 2.79 million shares on January 17 to over 16.3 million shares on January 18—about a 484% increase.

42.     On January 17, 2013, just hours before the publication of the Canadian newspaper article, Trader A established a CFD position in Life Technologies.  The day after the article was published, Trader A closed this position for a profit of approximately $1.5 million.

43.     In February 2013, Taylor directly or indirectly tipped Trader A with material nonpublic information about an additional deal advised by Investment Bank 1, so that Trader A could profitably trade.  Based on this tip, Trader A acquired a CFD position in Metals USA Holdings Corp. ("Metals USA"), in advance of the February 6, 2013 announcement that Reliance Steel & Aluminum Co. would acquire Metals USA and generated approximately $337,000 in illicit profits.

**D.     Taylor and Windsor Directly or Indirectly Tipped Trader A About Deals Advised by Investment Bank 2**

44.     On multiple occasions beginning in or about February 2013 through in or about August 2015, Taylor also directly or indirectly tipped to Trader A material nonpublic information that Taylor obtained from Windsor, who misappropriated the information from Investment Bank 2.

45.     For example, in or about February 2013, Taylor directly or indirectly tipped Trader A about a potential corporate transaction involving AmerisourceBergen Corp., a global drug distributor and health care services company headquartered in Chesterbrook, Pennsylvania. AmerisourceBergen's common stock trades on the NYSE under the ticker symbol ABC, and its options trade on various stock options markets in the United States.

46.     Beginning in or about January 2013, Windsor was copied on confidential communications regarding a potential corporate transaction involving AmerisourceBergen, Walgreens and Alliance Boots (code named "Project Forest").  Windsor, who was staffed on the Investment Bank 2 deal team, regularly sent and/or received internal communications about this potential transaction.

47.     On March 15, 2013, Windsor received an email regarding the status of the Project Forest negotiations from a co-worker leading the deal team.  Among other things, the email indicated that the parties had made "good progress over night" and most open items had been resolved.

48.     Also on March 15, 2013, Trader A opened a long spread bet position in AmerisourceBergen through a U.K.-based brokerage firm.

49.     On March 18, 2013, Windsor received additional updates throughout the day regarding the progress of the Project Forest negotiations, including that board meetings for deal approval were going ahead as planned.

50.     Also on March 18, 2013, Trader A placed another AmerisourceBergen spread bet trade, adding to the long position established on March 15, 2013.

51.     On March 19, 2013, before the U.S. markets opened, AmerisourceBergen, Walgreens, and Alliance Boots made a joint public announcement that the three companies were entering into a strategic relationship to streamline the distribution of pharmaceuticals to

11

Walgreens' stores and to expand Amerisource Bergen's relationship with Walgreens and Alliance Boots, including increased access to generic drugs and a ten-year primary pharmaceutical distribution contract with Walgreens.

52.     After the public announcement of the deal, AmerisourceBergen's stock price increased 4.3% from a closing price of $48.30 on March 18, 2013 to a closing price of $50.06 on March 19, 2013.

53.     On March 19, 2013, after the announcement, Trader A closed his entire spread bet position in AmerisourceBergen, generating profits of approximately $347,000.

54.     In total, in the same or similar manner described above, Taylor and Windsor directly or indirectly tipped Trader A about at least thirteen impending deals advised by Investment Bank 2.  While in possession of and based on material nonpublic information so misappropriated from Investment Bank 2, Trader A placed highly profitable trades as summarized in the chart below:

| Company/Ticker | Tender Offer? | Announcement/News | Profits |
|---|---|---|---|
| AmerisourceBergen ("ABC") | No | On March 19, 2013, ABC announced that it had formed a strategic relationship with Walgreens and Alliance Boots. | Trader A profited from trading CFDs in March 2013. |
| Heidrick & Struggles ("HSII") | No | On June 3, 2013, a media outlet reported that HSII received two acquisition offers. | Trader A profited from trading CFDs from April to June 2013. |
| Onyx Pharmaceuticals ("ONXX") | Yes | On June 28, 2013, a media outlet reported that Amgen had made an offer to purchase ONXX for $120 per share. | Trader A profited from trading CFDs and options in June and July 2013. |
| Idenix Pharmaceuticals ("IDIX") | No | On June 9, 2014, during the trading day, IDIX announced that it had agreed to be acquired by Merck & Co. | Trader A profited from trading in CFDs and equities in May and June 2014. |

| Company/Ticker | Tender Offer? | Announcement/News | Profits |
|---|---|---|---|
| Intermune ("ITMN") | No | Before the market opened on August 25, 2014, ITMN announced it had entered into an agreement to merge with Roche Holdings at a price of $74 per share. | Trader A profited from trading in CFDs and equities in August 2014. |
| Avanir ("AVNR") | Yes | On December 2, 2014, AVNR announced that it had agreed to be acquired by Otsuka Holdings for $17 per share pursuant to a tender offer. | Trader A profited from trading CFDs in November and December 2014. |
| Pharmacyclics ("PCYC") | Yes | After the market closed on March 4, 2015, PCYC announced that it would be acquired by AbbVie for $261.25 per share. | Trader A profited from trading CFDs in March 2015. |
| Hyperion ("HPTX") | Yes | On March 30, 2015, before the U.S. markets opened, HPTX announced that it agreed to be acquired for $46.00 per share. | Trader A profited from trading CFDs in March 2015. |
| Receptos ("RCPT") | Yes | On April 1, 2015 after the market closed, a media outlet reported that RCPT was considering offers to be acquired. | Trader A profited from trading CFDs in March and April 2015. |
| Omnicare ("OCR") | No | On May 20, 2015 after the market closed, a media outlet reported that CVS was in advanced talks to acquire OCR. | Trader A profited from trading equities, CFDs, and options in May 2015. |
| Thoratec ("THOR") | No | On July 22, 2015, THOR announced that it agreed to be acquired by St. Jude's. | Trader A profited from trading CFDs in July 2015. |
| Solera Holdings ("SLH") | No | On September 13, 2015, SLH announced that it had agreed to be acquired by Vista Equity Partners, for $55.85 per share. | Trader A profited from trading CFDs in September 2015. |
| EnerSys ("ENS") | No | On October 6, 2015, a media outlet reported that Johnson Controls was in early discussions to acquire ENS. | Trader A profited from trading CFDs in October 2015. |

**F.      Taylor and Windsor Directly or Indirectly Tipped El-Khouri About Pharmacyclics, Hyperion and 4 Other Deals Advised by Investment Bank 2**

55.      On multiple occasions beginning in or about March 2015 through in or about August 2015, Taylor also directly or indirectly tipped to El-Khouri material nonpublic information that he obtained from Windsor, who misappropriated the information from Investment Bank 2.

56.      For example, Taylor directly or indirectly tipped material nonpublic information to El-Khouri in connection with the March 4, 2015 announcement that AbbVie had agreed to acquire Pharmacyclics, Inc. ("Pharmacyclics") for $261.25 per share.

57.      On February 2, 2015, Windsor obtained access to an Investment Bank 2 presentation concerning the nonpublic merger discussions between Pharmacyclics and three potential acquirors.  The nonpublic document indicated that the three companies were actively engaged in due diligence and were working to provide an indication of interest in acquiring Pharmacyclics by March 3, 2015.

58.      On March 4, 2015, El-Khouri bought 5,000 Pharmacyclics CFDs.

59.      On that same day, Trader A purchased Pharmacyclics options and CFDs.

60.      On March 4, 2015, after the markets closed, Pharmacyclics and AbbVie announced that they had reached a merger agreement, whereby AbbVie would acquire all of the shares of Pharmacyclics for $261.25 per share, causing Pharmacyclics share price to increase by 17%.

61.      On March 5, 2015, El-Khouri sold the 5,000 CFDs he acquired the previous day, earning a profit of approximately $141,750.

62.     Similarly, in or about March 2015, Taylor obtained from Windsor and directly or indirectly tipped to El-Khouri material, nonpublic information about a potential corporate transaction involving the company Hyperion Therapeutics, Inc. ("Hyperion").

63.     Hyperion is a Brisbane, California-based pharmaceutical company that traded on the NASDAQ under the ticker symbol HPTX.

64.     In mid-December 2014, Investment Bank 2 made a presentation at a Hyperion board meeting, after which the Hyperion board agreed to work with Investment Bank 2 to further develop and refine the company's financial model and business plan.

65.     On January 9, 2015, Investment Bank 2 representatives attended a meeting of the Hyperion board of directors, during which Investment Bank 2 presented information about a potential transaction.  Shortly after the meeting, on January 10, 2015, Windsor accessed documents relating to Hyperion through Investment Bank 2's computer network, and did so again periodically between mid-January 2015 and February 9, 2015.

66.     On February 11, 2015, the CEO and CFO of Hyperion met with representatives of Horizon Pharma plc ("Horizon") in New York City.  During the meeting, the Horizon attendees expressed the company's interest in acquiring Hyperion.

67.     On March 3, 2015, Hyperion's CEO met with the CEO of a different pharmaceutical company that expressed interest in a possible corporate transaction with Hyperion.  Later that evening, Windsor accessed documents relating to Hyperion through Investment Bank 2's computer network, and did so again in the evening hours of Sunday, March 8, 2015 and Monday, March 9, 2015.

68.     Between March 9 and 13, 2015, Trader A purchased a total of 202,000 Hyperion CFDs.

15

69.     On March 14, 2015 (a Saturday), Hyperion's CEO spoke with Horizon's CEO. Among other things, Hyperion's CEO confirmed that the board was scheduled to meet on March 19, 2015 to consider Horizon's proposal, and that Hyperion intended to formally retain Investment Bank 2 as its financial advisor with regard to the proposed transaction.

70.     Also on March 14, 2015, Windsor accessed documents relating to Hyperion on Investment Bank 2's computer network.

71.     On Monday, March 16, 2015, El-Khouri began purchasing Hyperion CFDs.  He bought a total of 10,000 CFDs that day.

72.     On March 17, 2015, Hyperion executed a formal engagement letter with Investment Bank 2.  Also on March 17, 2015, Windsor accessed documents relating to Hyperion on Investment Bank 2's computer network.  However, Windsor was not assigned to work on any matters relating to Hyperion at any time, either before or after the formal engagement letter was executed with Investment Bank 2.

73.     Between March 17 and March 27, 2015, El-Khouri purchased and sold Hyperion CFDs, acquiring a total position of 23,000 Hyperion CFDs.

74.     On March 19, 2015, as scheduled, Hyperion held a board meeting, which was also attended by representatives of Investment Bank 2.  Later that day, Hyperion provided Horizon and its legal and financial advisors access to an electronic data room.

75.     Again, despite not being assigned to work on Hyperion-related matters in any capacity, Windsor continued to access documents related to Hyperion at Investment Bank 2, including in the late evening hours of March 18, 2015, and then again on March 20, March 21, March 25, and March 26, 2015.

76.     On Sunday, March 29, 2015, Hyperion's board unanimously approved the merger transaction with Horizon.  On March 30, 2015, before the U.S. markets opened, Horizon and

Hyperion announced that they had entered into a definitive agreement under which Horizon would acquire all of the shares of Hyperion's common stock via tender offer for $46.00 per share in cash (or approximately $1.1 billion on a fully diluted basis).

77.     Beginning on Monday, March 30, 2015, Trader A began selling CFDs in Hyperion, and continued selling at a profit until he had liquidated his entire position on April 16, 2015.  Trader A sold CFDs during that period of time at a share price ranging from $45.86 to $46.19, and made profits totaling approximately $2,000,000.

78.     On Monday, March 30, 2015, El-Khouri also sold all 23,000 of his Hyperion CFDs for a profit of approximately $149,642.

79.     In total, in the same or similar manner described above, Taylor and Windsor directly or indirectly tipped El-Khouri about at least six corporate transactions advised by Investment Bank 2.  While in possession of and based on material nonpublic information so misappropriated from Investment Bank 2, El-Khouri placed highly profitable trades as summarized in the chart below:

| Company/Ticker | Tender Offer? | Announcement/News | Profits |
|---|---|---|---|
| Pharmacyclics ("PCYC") | Yes | After the market closed on March 4, 2015, PCYC announced that it would be acquired by AbbVie for $261.25 per share. | El-Khouri made a profit of approximately $141,750 from trading CFDs in March 2015. |
| Hyperion ("HPTX") | Yes | On March 30, 2015, before the U.S. markets opened, HPTX announced that it agreed to be acquired for $46.00 per share. | El-Khouri made a profit of $149,642 from trading CFDs in March 2015. |
| Omnicare ("OCR") | No | On May 20, 2015 after the market closed, a media outlet reported that CVS was in advanced talks to buy OCR. | El-Khouri made a profit of approximately $295,580 from trading CFDs in April and May2015. |
| Receptos ("RCPT") | Yes | On April 1, 2015 after the market closed, a media outlet reported that RCPT was considering offers to be acquired. | El-Khouri acquired CFDs in March 2015.  On the day after the announcement, he had an unrealized profit of approximately $653,119. |

| Company/Ticker | Tender Offer? | Announcement/News | Profits |
|---|---|---|---|
| Solera Holdings ("SLH") | No | On September 13, 2015, SLH announced that it had agreed to be acquired by Vista Equity Partners, for $55.85 per share. | El-Khouri made a profit of approximately $563,681 from trading CFDs in August and September 2015. |
| EnerSys ("ENS") | No | On October 6, 2015, a media outlet reported that Johnson Controls was in early discussions to acquire ENS. | El-Khouri made a profit of approximately $568,457 from trading CFDs in September and October 2015. |

## FIRST CLAIM FOR RELIEF

*Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder*

80.     The Commission re-alleges and incorporates by reference Paragraphs 1 through 79 above as if they were fully set forth herein.

81.     Windsor and/or Taylor provided, or caused to be provided, material nonpublic information to one or more tippees, including Trader A and El-Khouri, knowing or having a reasonable expectation or recklessly disregarding that the tippee(s) would trade and/or tip others to trade on the basis of that information.  In each such instance, a reasonable investor would have viewed the information as being important to his or her investment decision.

82.     Taylor and Windsor had a duty to maintain the confidentiality of the material nonpublic information they tipped to others by virtue of their employment with Investment Bank 1 and Investment Bank 2 respectively.  Windsor and Taylor breached those duties by providing such material nonpublic information to others for use in connection with securities trading and in exchange for personal benefits or with the expectation of receiving a benefit.

83.     Taylor knew, was reckless in not knowing, should have known, or consciously avoided knowing that the material nonpublic information he obtained from Windsor was disclosed or misappropriated in breach of a fiduciary duty or obligation arising from a similar relationship of trust or confidence.  Taylor knew, should have known or recklessly disregarded

18

that Windsor communicated such information to Taylor for, and with the expectation of receiving, a benefit.

84.     El-Khouri traded securities while in possession, and on the basis, of material nonpublic information provided directly or indirectly by Windsor and Taylor.  In each such instance, El-Khouri knew or recklessly disregarded that the information provided was material and nonpublic.  El-Khouri also knew, recklessly disregarded, should have known, or consciously avoided knowing that such material nonpublic information had been conveyed or obtained in breach of a duty or obligation arising from a similar relationship of trust or confidence.

85.     By engaging in the conduct described above, Taylor, Windsor, and El-Khouri directly or indirectly, in connection with the purchase or sale of securities, by the use of means or instrumentalities of interstate commerce, or of the mails, with scienter:

> (a) employed devices, schemes, or artifices to defraud;
>
> (b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and
>
> (c) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons, including purchasers and sellers of securities.

86.     By reason of the actions alleged herein, Taylor, Windsor, and El-Khouri violated and, unless restrained and enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## SECOND CLAIM FOR RELIEF

*Violations of Section 14(e) of the Exchange Act and Rule 14e-3 Thereunder*

87.     The Commission re-alleges and incorporates by reference Paragraphs 1 through 79 above as if they were fully set forth herein.

88.     By engaging in the conduct described above, Taylor and Windsor, prior to the

public announcement of tender offers, and after a substantial step or steps to commence each of the tender offers had been taken, while in possession of material information relating to each of the tender offers, which information they knew or had reason to know was nonpublic and had been acquired directly or indirectly from the offering company, the issuer, or any officer, director, partner, or employee, or other person acting on behalf of the offering company or issuer, communicated material nonpublic information relating to each of the tender offers under circumstances in which it was reasonably foreseeable that the communication was likely to result in the purchase and sale of the securities sought or to be sought by such tender offers.

89.     By engaging in the conduct described above, El-Khouri, prior to the public announcement of tender offers, and after a substantial step or steps to commence each of the tender offers had been taken, while in possession of material information relating to the tender offers, which information he knew or had reason to know was nonpublic and had been acquired directly or indirectly from the offering company, the issuer, or any officer, director, partner, or employee, or other person acting on behalf of the offering company or issuer, purchased or caused to be purchased or sold or caused to be sold  the securities sought or to be sought by such tender offers.

90.     By reason of the actions alleged herein, Taylor, Windsor, and El-Khouri violated and, unless restrained and enjoined, will continue to violate Section 14(e) of the Exchange Act [15 U.S.C. § 78n(e)] and Rule 14e-3 thereunder [17 C.F.R. § 240.14e-3].

### **PRAYER FOR RELIEF**

WHEREFORE, the Commission respectfully requests that this Court enter a judgment:

I.

Finding that Defendants Taylor, Windsor, and El-Khouri violated Sections 10(b) and 14(e) of the Exchange Act [15 U.S.C. §§ 78j(b), 78n(e)] and Rules 10b-5 and 14e-3 thereunder

[17 C.F.R. §§ 240.10b-5, 240.14e-3]

## II.

Permanently restraining and enjoining Defendants from violating Sections 10(b) and 14(e) of the Exchange Act [15 U.S.C. §§ 78j(b), 78(n)(e)] and Rules 10b-5 and 14e-3 thereunder [17 C.F.R. §§ 240.10b-5, 240.14e-3].

## III.

Ordering Taylor, Windsor, and El-Khouri to disgorge, with prejudgment interest, all illicit trading profits or other ill-gotten gains received as a result of the actions alleged herein and within the relevant statute of limitations.

## IV.

Ordering Taylor, Windsor, and El-Khouri to pay civil penalties pursuant to Section 21A of the Exchange Act [15 U.S.C. § 78u-l]; and

## V.

Granting such other and further relief as this Court may determine to be just and appropriate.

Dated:  October 22, 2019

By:  _Assunta Vivolo_

Joseph G. Sansone
Assunta Vivolo
Caitlyn Campbell
Michael D. Foster*
Rua M. Kelly*
U.S. Securities and Exchange Commission
New York Regional Office
200 Vesey Street, Suite 400
New York, New York 10281-1022
(215) 597-1047 (Vivolo)
vivoloa@sec.gov

*Not admitted in the S.D.N.Y.