UNITED STATES SECURITIES AND
EXCHANGE COMMISSION,

        Plaintiff,

        v.

BENJAMIN TAYLOR, DARINA WINDSOR,
JOSEPH ABDUL NOOR EL-KHOURI, and
GEORGE NIKAS,

        Defendants.

**Civil Action No. 19-09744 (LAP)**

**JURY TRIAL DEMANDED**

## FIRST AMENDED COMPLAINT

Plaintiff United States Securities and Exchange Commission ("the Commission"), for its

Complaint against Defendants Benjamin Taylor ("Taylor"), Darina Windsor ("Windsor"),

Joseph Abdul Noor El-Khouri ("El-Khouri"), and George Nikas ("Nikas") alleges as follows:

### SUMMARY OF THE ACTION

1.      Between at least December 2012 and at least August 2015, while working as

investment bankers in London, England, Taylor and Windsor participated in an international

insider trading scheme that netted its participants tens of millions of dollars in illicit profits from

trading in the securities of U.S. companies. During that period, while engaged in a romantic

relationship, Taylor and Windsor carried out the scheme by misappropriating from their

respective employers material nonpublic information concerning impending corporate

transactions (such as mergers, acquisitions, and tender offers), tipping such commercially

sensitive information, through an intermediary, to other individuals who used it to trade

securities, and sharing in the resulting proceeds of the illegal securities transactions. Nikas[1] and El-Khouri were two of the individuals who received and profitably traded on the basis of material nonpublic information tipped by Taylor and Windsor.[2]

2.     Beginning in at least December 2012, Taylor obtained material nonpublic information about corporate transactions from the investment bank at which he was employed ("Investment Bank 1") and on more than one occasion, through an intermediary, tipped this information to a trader based in Switzerland ("Trader A"), for use in trading securities. Trader A, in turn, tipped the material nonpublic information to his friend Nikas in exchange for a share of the profits that Nikas generated trading on these tips.

3.     Beginning in at least February 2013, Taylor, through an intermediary, also tipped Trader A with material nonpublic information that Taylor obtained from his girlfriend Windsor, who worked at a different investment bank ("Investment Bank 2"). Trader A used the tips to place profitable trades and further provided those tips to Nikas in exchange for a share of the profits that Nikas generated trading on these tips.

4.     In addition, beginning in at least March 2015, Taylor, through an intermediary, also tipped to El-Khouri the information that Taylor received from Windsor.

5.     In providing these tips, Taylor and/or Windsor disregarded Investment Bank 1's and Investment Bank 2's internal policies, which dictated that information related to corporate transactions must be kept confidential. Windsor provided the information to Taylor with the

---

[1] The Commission has filed a civil action alleging that Nikas also traded on material nonpublic information in a second insider trading scheme involving former investment banker Bryan Cohen. *See SEC v. Cohen and Nikas*, 19-cv-9645 (CM).

[2] On March 3, 2020, the Commission filed a civil action against Dov Malnik ("Malnik") and Tomer Feingold ("Feingold"), alleging that the defendants also traded on material nonpublic information obtained by Taylor and/or Windsor and tipped to Trader A, who tipped Malnik and Feingold. *See SEC v. Feingold and Malnik*, 20-cv-1881 (UA).

knowledge that he would tip the information to others who would use it to trade securities and/or further tip the information to others who would place the trades.

6.      Taylor and Windsor expected to, and in fact did, receive, directly or indirectly from Trader A, Nikas, and El-Khouri, cash and other benefits in exchange for the insider tips they provided.

7.      Based on the tips that Windsor and Taylor provided, Trader A, Nikas, and El-Khouri collectively realized millions in illicit gains from trading the securities of at least a dozen different public companies in advance of news that these companies had been targeted for acquisition in contemplated or agreed upon corporate deals.  At all relevant times, each company's common stock was registered with the Commission under Section 12(b) of the Exchange Act.  At all relevant times, the securities of each company traded on United States securities exchanges, including the New York Stock Exchange ("NYSE") and the NASDAQ Stock Market ("NASDAQ").  Both NYSE and NASDAQ are located in New York, New York.

8.      By knowingly or recklessly engaging in the conduct described in this Complaint, Defendants violated, and unless restrained and enjoined will continue to violate, Sections 10(b) and 14(e) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78j(b), 78n(e)] and Rules 10b-5 and 14e-3 thereunder [17 C.F.R. §§ 240.10b-5, 240.14e-3].

**NATURE OF PROCEEDING AND RELIEF SOUGHT**

9.      The Commission brings this action under Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)].  The Commission seeks permanent injunctions against the Defendants, to enjoin them from engaging in the transactions, acts, practices, and courses of business alleged in this Complaint; disgorgement of profits realized within the five-year statute of limitations from the unlawful insider trading set forth herein, along with prejudgment interest; and civil monetary

penalties pursuant to Section 21A of the Exchange Act [15 U.S.C. § 78u-1], and such other relief as the Court may deem just and appropriate.

**JURISDICTION AND VENUE**

10.    This Court has jurisdiction over this action under Sections 21(d), 21(e), 21A, and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), 78u-1, and 78aa].  Certain of the acts, practices, transactions, and courses of business constituting the violations made use of a means or instrumentality of interstate commerce, or of the mails, and/or of the facilities of national securities exchanges.

11.    Venue in this District is proper under Section 27 of the Exchange Act [15 U.S.C. § 78aa], because certain of the acts, practices, transactions, and courses of business constituting the violations alleged in this Complaint occurred in the Southern District of New York.

**DEFENDANTS**

12.    **Taylor**, age 36, resides in France.  Between approximately February 2010 and May 2014, Taylor worked in the London office of Investment Bank 1, whose global headquarters are in New York City.  Taylor worked for other investment banks before and after his employment with Investment Bank 1.

13.    **Windsor**, age 32, is a native of Thailand who resided in London from approximately 2010 to 2016 and currently resides in Thailand.  Windsor worked at Investment Bank 1 from July 2010 through September 2012, where she met Taylor.  From September 2012 through January 2016, Windsor worked as an investment banker at the London office of Investment Bank 2, whose global headquarters are in New York City.

14.    **Nikas,** age 54, is a Greek citizen who has a residence in New York, New York and owns a restaurant chain, "GRK Fresh," with restaurants in Manhattan.  Nikas also has a residence in Athens, Greece.

15.    **El-Khouri**, age 52, is a Lebanese national who resides in Monaco and in London. During the relevant time, El-Khouri had accounts at brokerage firms in London, England.

## TYPES OF SECURITIES TRADED

16.    In connection with the scheme to trade on material nonpublic information tipped by Taylor and/or Windsor, Trader A, Nikas, and El-Khouri established "long" positions in companies that were targeted for acquisition by purchasing shares of common stock, options and other derivative financial instruments known as contracts-for-difference ("CFDs") and/or spread bets. CFDs and spread bets are not traded in the United States, but are traded based on securities listed on U.S. exchanges, including NYSE and NASDAQ.

17.    A CFD is an agreement between two parties to exchange the difference in value of an underlying stock between the time the contract is opened and the time at which it is closed. If the share price of the underlying stock increases, the seller pays the difference to the buyer; however, if the share price declines, the buyer must pay the seller. A CFD thus mirrors the movement and pricing of its underlying stock on a dollar-for-dollar basis, such that any fluctuation in the market price of the underlying security is reflected in the unrealized gain or loss of the CFD position. The purchase and sale prices of CFDs are identical to the prices quoted for the shares on the public exchange on which the underlying common stock is listed.

18.    An equity CFD purchaser typically initiates a long position in the same manner in which he or she would purchase common stock, by submitting an order with a CFD provider to buy a certain number of CFDs in a particular stock. The CFD provider ordinarily purchases a corresponding number of shares of the underlying stock to hedge its position and writes the CFDs to the client at the same price. As with stock transactions, the buyer is able to enter market, limit or stop loss orders when initiating CFD positions.

19.     Spread bets are another form of leveraged financial instrument that enable investors to wager on the price movement of an underlying security, such as the common stock of U.S. listed companies.  In the United Kingdom, spread bet contracts may be purchased in increments of a particular number of "pounds per point," meaning that the purchaser profits that number of British pounds for each one cent price change in the underlying security.  As with CFDs, the profit or loss associated with spread bet contracts, after deducting the costs and fees charged by the firm, depend entirely on the price of the underlying stock as reflected in trades on the national securities exchanges in the United States.

20.     As set forth below, Trader A, Nikas, and El-Khouri purchased CFDs and/or made spread bets on U.S. companies through foreign brokerage firms.  These firms hedged their exposure by purchasing shares of the underlying companies on U.S. exchanges through domestic brokerage firms, or purchasing CFDs or spread bets through other foreign brokerage firms, which in turn purchased the shares of the underlying companies on U.S. exchanges through domestic brokerage firms.

## FACTUAL ALLEGATIONS

**A.**     **Taylor's and Windsor's Access to Material Nonpublic Information and Duties to Maintain Confidentiality**

21.     In or about 2010, Taylor and Windsor met while working together at Investment Bank 1 in London, England.  Both Taylor and Windsor worked on deal teams advising bank clients on confidential corporate transactions, including transactions involving publicly traded U.S. companies.

22.     In or about September 2012, Windsor left Investment Bank 1 and began working in a similar capacity in the London office of Investment Bank 2.

23.     Thereafter, Taylor and Windsor continued to communicate and socialize frequently via email, telephone, and in person. For most (if not all) of the relevant time period, they also lived together.

24.     Taylor knew that Windsor had access to confidential and commercially sensitive information about publicly traded companies through her employment at Investment Bank 2, just as Taylor had access to such information through his employment at Investment Bank 1.

25.     In connection with their employment at the respective banks, both Taylor and Windsor were subject to specific policies and procedures aimed at ensuring the confidentiality of nonpublic information and preventing the misuse of such information for personal gain through securities trading or other means. For example, in order to obtain the information supplied to Trader A, Nikas, and El-Khouri, Windsor and Taylor repeatedly accessed internal electronic files of their respective employers, including files for deals on which they were not staffed and for which they had no business reason to review.

26.     As set forth below, Taylor and Windsor repeatedly violated these policies.

**B.     Overview of the Insider Trading Scheme**

27.     By at least early 2013, if not earlier, Taylor and Windsor participated in a fraudulent scheme to tip material nonpublic information to Trader A for use in trading securities.

28.     Taylor and Windsor participated in the scheme because they expected to receive a share of the profits that Trader A generated by placing the illegal trades. Indeed, in February or March 2013, shortly after the scheme began, Windsor created an excel file, entitled Popsy (her pet name for Taylor), that detailed how the profit would be split from an expected investment:

| | USD | | GBP | |
|---|---|---|---|---|
| Amount | 2,000,000 | | | |
| % | | 20.0% | | |
| | | | | |
| Profit | 400,000 | | | |
| Swiss | 200,000 | 50% | | |
| Mine | 100,000 | 50% | 66,667 | 1.5 |
| | | 100 | | 50 |
| Note | 1000 | | 1,333 | |

29.  Among other things, the spreadsheet calculates the amount of specific US and British currency, in denominations of hundred dollar bills and 50 pound notes respectively, required to make the requisite cash payment of Windsor's share of the trading proceeds.

30.  Taylor and Windsor in fact received substantial cash payments and other benefits (such as watches, clothing, other luxury items, and travel) in exchange for the insider trading tips to Trader A.

31.  Beginning in at least late 2012, in addition to using Taylor's and/or Windsor's tips to trade securities, Trader A tipped the inside information obtained from Taylor and/or Windsor to his friend Nikas in exchange for a share of the profits that Nikas generated trading on these tips.

32.  Nikas knew that Trader A was paying for the inside information that Trader A tipped to Nikas.

33.  Nikas and Trader A have known each other since at least early 2011, often communicating with each other via email and/or phone.  In or about May 2012, Trader A traveled to New York City and stayed overnight at Nikas's apartment for several days. In addition, on at least two occasions in 2013, Nikas provided to Trader A illegal tips of material nonpublic information about discussions between U.S.-based biotechnology company Ariad Pharmaceuticals, Inc. ("Ariad") and the U.S. Food and Drug Administration ("FDA") concerning the safety and efficacy of Ariad's drug, Iclusig.  Nikas received this highly confidential information from a close friend whose father was a member of the Ariad board of directors.

Both Nikas and Trader A exploited this informational advantage to reap millions in profits by placing well-timed securities trades ahead of Ariad's public disclosures regarding clinical testing and marketing of Iclusig on October 9 and December 20, 2013, respectively.

34.     Starting in at least early 2015, Taylor and Windsor also participated in a fraudulent scheme to directly or indirectly tip material nonpublic information to El-Khouri for trading purposes and a share of the profits, which they in fact received in the form of cash and other payments.

35.     Based on the material nonpublic information that Taylor and Windsor directly or indirectly provided, Trader A, Nikas, and El-Khouri generated substantial profits purchasing the securities of companies that had been targeted for acquisition in advance of such inside information being disclosed to the public.

C.      **Trader A and Nikas Trade on Tips of Inside Information From Taylor and Windsor About Deals Advised by Investment Bank 1**

36.     On multiple occasions beginning in or about January 2013, Taylor, through an intermediary, provided material nonpublic information to Trader A concerning deals advised by his then-employer, Investment Bank 1, and Trader A in turn passed the information to Nikas.

**Life Technologies**

37.     For example, in or about January 2013, Taylor, through an intermediary, tipped Trader A about the potential acquisition of Life Technologies Corporation, a biomedical laboratory equipment maker based in Carlsbad, California. Life Technologies' common stock traded on the NASDAQ under the ticker symbol LIFE.

38.     In or about April 2011, Life Technologies executed a multi-year confidentiality agreement with Investment Bank 1. Among other things, Investment Bank 1 was involved in the

process for evaluating the company's strategic alternatives. Investment Bank 1 was formally retained as a financial adviser to Life Technologies in or about October 2012.

39.     Around November 10, 2012, the review of strategic alternatives was assigned the code name "Project Liberty" to maintain its confidentiality. Life Technologies and Investment Bank 1 also utilized other procedures to safeguard the confidentiality of Project Liberty, including requiring potential buyers of Life Technologies to sign confidentiality agreements.

40.     During November and December 2012, Life Technologies' investment bankers, including Investment Bank 1, contacted potential buyers. By the end of December 2012, six potential buyers signed confidentiality agreements with the company in order engage in further discussions regarding a potential transaction.

41.     On January 1, 2013, these six potential acquirers were granted access to an online data room to facilitate the confidential review of key documents and information regarding Life Technologies.

42.     Between at least January 7 and January 11, 2013, Taylor electronically accessed dozens of internal documents relating to Project Liberty and Investment Bank 1's work for Life Technologies, even though Investment Bank 1 had not assigned Taylor to work on the project. Among other documents, Taylor accessed the Project Liberty data room index, six confidentiality agreements executed by potential buyers, as well as PowerPoint presentations prepared for Life Technologies' management and board of directors, which referenced potential acquisition prices and other confidential, nonpublic information. Taylor, directly or indirectly, tipped Trader A about the potential acquisition of Life Technologies and provided him with confidential documents from the online data room.

43.     On January 11, 2013, based on tips from Trader A, Nikas began building a position in the securities of Life Technologies. That day, Nikas purchased 500 shares of Life

10

Technologies and 100 Life Technologies call options in a brokerage account that he maintained in the United States ("Nikas U.S. Account 1"). On January 14, 2013, Nikas purchased 1,000 Life Technologies CFDs through a brokerage account held in his name in Denmark ("Nikas Denmark Account 1"). On January 15, 2013, Nikas purchased 2,000 shares of Life Technologies and 140 Life Technologies call options in the Nikas U.S. Account 1. On January 16, 2013 and the morning of January 17, 2013, Nikas sold all 2,500 of his Life Technologies shares in the Nikas U.S. Account 1 at a small loss. Later in the day on January 17, he purchased 7,000 Life Technology shares in the Nikas U.S. Account 1, as well as 7,888 Life Technologies CFDs in the Nikas Denmark Account 1.

44.     On or about January 16 and 17, 2013, Trader A provided to a reporter at a newspaper based in Canada confidential Life Technologies documents that Trader A had obtained indirectly from Taylor. These documents included the Project Liberty data room index, five of the six confidentiality agreements that Life Technologies entered into with potential buyers, and select pages from the PowerPoint presentations that Taylor had accessed.

45.     On January 17, 2013, Trader A also purchased 1,510 Life Technologies CFDs in anticipation of the Canadian newspaper breaking the story of the potential Life Technologies acquisition.

46.     After the market closed on January 17, 2013, at approximately 5:45 p.m. EST, the Canadian newspaper published an article reporting that Life Technologies was engaged in a sale process and had hired financial advisors, including Investment Bank 1, to assist with the process. Citing "materials seen by the [Canadian newspaper]" and "documents seen by this newspaper," the article specifically mentioned four of the potential buyers by name and noted that they had signed confidentiality agreements which gave them access to a data room. The article further disclosed the potential offering price range ($65-$75 per share) that was included in PowerPoint

presentations that Taylor had accessed and that were provided to the Canadian newspaper by Trader A.

47.     The next day, January 18, 2013, before the market opened, Life Technologies issued a press release acknowledging in part what the Canadian newspaper had reported – namely, that the corporation's board had retained Investment Bank 1 and another firm to assist with an annual strategic review.  Life Technologies' share price jumped in reaction to the news article and the press release, opening at $61.23 on January 18, an increase of $6.26 per share, or about 11%, from the prior day's closing price on January 17.  Volume of trading in the common stock of Life Technologies increased from 2.79 million shares on January 17 to over 16.39 million shares on January 18 – an increase of about 487%.

48.     On January 18, 2013, Trader A sold his Life Technologies CFD position for a profit of approximately $1.2 million.

49.     Also on January 18, 2013, Nikas sold his Life Technologies positions in the Nikas U.S. Account 1 for a profit of approximately $130,000 and in the Nikas Denmark Account 1 for a profit of approximately $56,000.

50.     Taylor, working through an intermediary, also tipped Trader A with material nonpublic information related to other companies that were advised by Investment Bank 1.

**Metals USA**

51.     For example, beginning in at least December 2012, Taylor, working through an intermediary, tipped Trader A with material nonpublic information about Metals USA Holdings Corp. ("Metals USA"), a company that traded on the NYSE under the ticker symbol MUSA.

52.     Between December 7 and 10, 2012, Taylor began to access electronic files related to Investment Bank 1's client, Reliance Steel & Aluminum Co. ("Reliance"); Investment Bank 1 had been retained as a financial advisor to Reliance in connection with the potential acquisition

of Metals USA.  Taylor accessed these confidential files despite the fact that he was not assigned to the Reliance deal team at Investment Bank 1.

53.     Between December 17 and 20, 2012, Trader A purchased 400 Metals USA CFDs.

54.     On December 26, 2012, Nikas purchased 5,000 shares of Metals USA through the Nikas U.S. Account 1.  Nikas continued to purchase Metals USA shares between January 4 and 7, 2013 through the Nikas U.S. Account 1.

55.     On January 7, 2013, Taylor again accessed electronic files related to the potential acquisition of Metals USA by Reliance.

56.     On January 9, 2013, Trader A closed his Metals USA CFD position for a profit of approximately $32,000.

57.     On January 10 and 11, 2013, Nikas closed his Metals USA position at a small loss.

58.     On January 18, 2013, Trader A purchased 300 Metals USA CFDs, while Nikas purchased 5,000 shares of Metals USA through the Nikas U.S. Account 1.  Trader A added another 320 Metals USA CFDs to his position on January 28 and 30, 2013.

59.     On February 5, 2013, Taylor again accessed electronic files related to the potential acquisition of Metals USA by Reliance.

60.     The following day, February 6, 2013, Reliance announced that it would acquire all outstanding shares of Metals USA for $20.65 per share in cash.  Trader A and Nikas subsequently liquidated their positions in Metals USA; Trader A generated approximately $337,000 in illicit profits, while Nikas netted approximately $15,000 in illicit profits.

**D.** **Trader A and Nikas Trade on Tips of Inside Information from Taylor and Windsor About Deals Advised by Investment Bank 2**

61.     On multiple occasions beginning in or about February 2013 through in or about August 2015, Taylor, through an intermediary, also tipped to Trader A material nonpublic information that Taylor obtained from Windsor, who misappropriated the information from Investment Bank 2.  Trader A then tipped that material nonpublic information to Nikas.

**AmerisourceBergen**

62.     For example, in or about February 2013, Taylor, through an intermediary, tipped Trader A about a potential corporate transaction involving AmerisourceBergen Corp. ("AmerisourceBergen"), a global drug distributor and health care services company headquartered in Chesterbrook, Pennsylvania.  AmerisourceBergen's common stock trades on the NYSE under the ticker symbol ABC.

63.     Beginning in or about January 2013, Windsor was copied on confidential communications regarding a potential corporate transaction involving AmerisourceBergen, Walgreens and Alliance Boots (code named "Project Forest").  At all times relevant to the Complaint, Investment Bank 2 served as the financial advisor to Alliance Boots.  Windsor, who was staffed on the Investment Bank 2 deal team, regularly sent and/or received internal communications about confidential negotiations between these three companies to create a partnership to broaden distribution of generic and branded pharmaceutical products.

64.     On Thursday, February 7, 2013, Windsor received an email from another employee of Investment Bank 2 that summarized the status of negotiations between AmerisourceBergen and Alliance Boots, including the projected public announcement of the transaction "around the third week of March [2013]."  The following day, February 8, 2013, Windsor received emails from her colleague about key documents in the Project Forest data

room and suggested that they catch up that afternoon. Also on February 8, 2013, Windsor emailed Taylor with the subject line: "Urgent – Check BB [Blackberry.]"

65.     Windsor tipped Taylor with information about the impending deal between Walgreens, Alliance Boots, and AmerisourceBergen and Taylor, directly or indirectly, passed this information to Trader A, who further tipped it to Nikas.

66.     On Monday, February 11, 2013, Nikas, having been tipped by Trader A, began purchasing AmerisourceBergen common stock in the Nikas U.S. Account 1, purchasing 5,000 shares between February 11 and 19, 2013.

67.     Between February 11 and March 4, 2013, Nikas also bought (and subsequently sold) a total of 350 AmerisourceBergen call options, and then purchased 45 AmerisourceBergen call options on March 13, 2013 in the Nikas U.S. Account 1.

68.     On March 14, 2013, Nikas began building a position in the Nikas Denmark Account 1, purchasing 5,000 AmerisourceBergen CFDs, and between March 14 and 15, 2013, Nikas bought an additional 5,000 shares of AmerisourceBergen and 300 AmerisourceBergen call options through the Nikas U.S. Account 1.

69.     On March 15, 2013, at approximately 7:49 a.m. EST, Windsor received an email regarding the status of the Project Forest negotiations from a co-worker leading the deal team. Among other things, the email indicated that the parties had made "good progress over night" and most open items had been resolved.

70.     Also on March 15, 2013, Trader A placed a long spread bet position in AmerisourceBergen through a U.K.-based brokerage firm, buying 700 spread bets at a price of approximately $3.3 million.

71.     On March 18, 2013, Windsor received additional updates throughout the day regarding the progress of the Project Forest negotiations, including that the companies' boards of directors were meeting to vote on the proposed transaction.

72.     Also on March 18, 2013, Trader A bought another 700 AmerisourceBergen spread bets for approximately $3.3 million, doubling the long position established on March 15, 2013.

73.     That same day, Nikas purchased an additional 11,000 AmerisourceBergen CFDs in his Nikas Denmark Account 1 and added 20,000 more AmerisourceBergen shares to his position in the Nikas U.S. Account 1.

74.     Before the U.S. markets opened on March 19, 2013, AmerisourceBergen, Walgreens, and Alliance Boots made a joint public announcement that the three companies were entering into a strategic relationship to streamline the distribution of pharmaceuticals to Walgreens' stores and to expand AmerisourceBergen's relationship with Walgreens and Alliance Boots, including increased access to generic drugs and a ten-year primary pharmaceutical distribution contract with Walgreens.

75.     After the public announcement of the deal, AmerisourceBergen's stock price increased 3.6% from a closing price of $48.30 on March 18, 2013 to a closing price of $50.06 on March 19, 2013.

76.     On March 19, 2013, after the announcement, Trader A sold his entire AmerisourceBergen spread bet position, generating profits of approximately $347,000.

77.     Nikas similarly began liquidating his AmersourceBergen position on March 19, 2013, and ultimately made at least $143,000 in profits in the Nikas U.S. Account 1 as well as $34,000 in profits in the Nikas Denmark Account 1.

**Omnicare**

78.      In May 2015, Nikas also traded timely and profitably in securities of Omnicare, Inc. ("Omnicare") in advance of the company's acquisition, based on Trader A's tips of material nonpublic information originating from Windsor and Taylor.  Omnicare was a U.S.-based healthcare company that traded on the NYSE under the ticker symbol OCR.

79.      In or about February 2015, Omnicare formally engaged Investment Bank 2 as a financial advisor to the board of directors in connection with a review of strategic alternatives including the potential sale of Omnicare.  Representatives of Investment Bank 2 then met with potential buyers over the following months.

80.      On several occasions, beginning on March 25, 2015, Windsor accessed electronic files maintained by Investment Bank 2, which included a presentation to the Omnicare board of directors concerning the strategic rationales for the company to be acquired by several potential buyers.  Windsor was not staffed on the deal team at Investment Bank 2 that was working on the potential sale of Omnicare.  On April 13, 2015, Windsor accessed a draft slide deck prepared by Investment Bank 2 in connection with the firm's ongoing services as a financial adviser to Omnicare.

81.      From April 18, 2015 through April 28, 2015, Omnicare negotiated and executed non-disclosure agreements with five potential buyers, including CVS Health Corp. ("CVS"). Meanwhile, Windsor continued to access the electronic project folder Investment Bank 2 maintained concerning Omnicare's strategic review.

82.      On April 22, 2015, a news article reported that Omnicare was exploring a sale of the company and was working with financial advisers; the same media outlet published a follow-up article on April 30, 2015 that referenced Investment Bank 2 and identified potential Omnicare

buyers. The April 22 and 30, 2015 news articles did not provide information about the potential sale price, and the companies did not confirm that such negotiations had taken place.

83. On May 1, 2015, on the basis of tips of inside information originating from Windsor, Nikas purchased 3,000 shares of Omnicare in a second brokerage account held in his name in the United States ("Nikas U.S. Account 2"), and added another 3,000 shares to that position between May 4 and 6, 2015.

84. On May 8, 2015, the Omnicare board of directors met to discuss the review of strategic alternatives; Investment Bank 2 participated in the meeting and provided the board with an update regarding the work it had done. The Omnicare board also discussed the media coverage of the process, and Omnicare's outside counsel led a discussion in the importance of exercising care to maintain the confidentiality of information relating to the strategic alternatives review process.

85. Also on May 8, 2015, based on material nonpublic information provided by Windsor, Trader A purchased 10,000 shares of Omnicare. Between May 11 and May 14, 2015, Trader A purchased an additional 65,000 shares of Omnicare. Trader A then sold 20,000 shares of Omnicare on May 18, and bought approximately 172,000 more shares the same day.

86. Similarly, on May 8, 2015, Nikas bought 2,000 shares of Omnicare in the Nikas U.S. Account 2, and continued to add to his position over the following days. Between May 13 and May 19, 2015, Nikas bought 5,000 more Omnicare shares, for a total of 13,000 shares in the Nikas U.S. Account 2. Also on May 19, 2015, Nikas purchased 1,000 Omnicare CFDs in the Nikas Denmark Account 1.

87. On May 20, 2015, the Omnicare board of directors met – with representatives of Investment Bank 2 in attendance – and voted to approve the proposed merger with CVS.

88.     Also on May 20, 2015, during the course of the trading day and on the basis of tips originating from Windsor, Nikas bought 30 Omnicare call options, and purchased an additional 12,000 Omnicare shares, all in the Nikas U.S. Account 2.  Also on May 20, 2015, Nikas purchased another 14,000 Omnicare CFDs in the Nikas Denmark Account 1, and bought 22,000 Omnicare CFDs that day in a second account held in Denmark in the name of one of Nikas's family members ("Nikas Denmark Account 2").

89.     On May 20, 2015, after the U.S. markets closed, at approximately 5:59 pm, the news media reported that CVS was in advanced talks to acquire Omnicare.  The share price for Omnicare climbed immediately in the wake of the article, increasing 2.5 percent in after-hours trading.  On May 21, 2015, before the U.S. markets opened, Omnicare and CVS issued a joint press release, announcing the execution of the merger agreement.

90.     Beginning on May 21, 2015, Nikas sold the Omnicare positions he had amassed. Nikas's illicit profits in the Nikas U.S. Account 2 totaled approximately $92,303, while his illicit profits in the Nikas Denmark Accounts 1 and 2 totaled approximately $42,432, for overall realized profits of $134,735.

91.     Similarly, on May 21, 2015, Trader A also sold his Omnicare position and generated more than $889,000 in illicit profits.

92.     Furthermore, Taylor and Windsor directly or indirectly tipped Trader A, in the same or similar manner described above, about at least ten other impending deals advised by Investment Bank 2, and Trader A then traded profitably on those tips. In many such instances, Trader A further tipped this information to Nikas, who also traded.  While in possession of and based on material nonpublic information so misappropriated from Investment Bank 2, Trader A and/or Nikas placed additional timely and profitable trades as summarized in the chart below:

| Company/Ticker | Announcement/News | Profits |
|---|---|---|
| Heidrick & Struggles International, Inc. ("HSII") | On June 3, 2013, a media outlet reported that HSII received two acquisition offers. | Trader A profited approximately $264,683 from trading CFDs from April to June 2013. |
| Onyx Pharmaceuticals, Inc. ("ONXX") | On June 28, 2013, a media outlet reported that Amgen Inc. had made an offer to purchase ONXX for $120 per share. | Trader A profited approximately $8,184,184 from trading in CFDs and options in June and July 2013. Nikas profited approximately $3,142,246 from trading equities and options in June and July 2013. |
| Idenix Pharmaceuticals, Inc. ("IDIX") | On June 9, 2014, during the trading day, IDIX announced that it had agreed to be acquired by Merck & Co. | Trader A profited approximately $13,135,362 from trading in CFDs and equities in May and June 2014. Nikas profited approximately $1,218,789 from trading equities in May and June 2014. |
| InterMune, Inc. ("ITMN") | Before the market opened on August 25, 2014, ITMN announced it had entered into an agreement to merge with Roche Holdings at a price of $74 per share. | Trader A profited approximately $5,139,748 from trading in CFDs and equities in August 2014. Nikas profited approximately $210,779 from trading equities in August 2014. |
| Avanir Pharmaceuticals, Inc. ("AVNR") | On December 2, 2014, AVNR announced that it had agreed to be acquired by Otsuka Holdings Co., Ltd. for $17 per share pursuant to a tender offer. | Trader A profited approximately $41,113 from trading in CFDs in November and December 2014. Nikas profited approximately $56,730 from trading equities in November and December 2014. |
| Pharmacyclics, Inc. ("PCYC") | After the market closed on March 4, 2015, PCYC announced that it would be acquired by AbbVie, Inc. for $261.25 per share. | Trader A profited approximately $6,125,677 from trading CFDs and options in March 2015. |
| Hyperion Therapeutics, Inc. ("HPTX") | On March 30, 2015, before the U.S. markets opened, HPTX announced that it had agreed to be acquired by Horizon Pharma plc for $46.00 per share. | Trader A profited approximately $2,018,235 from trading CFDs in March 2015. |
| Receptos, Inc. ("RCPT") | On the afternoon of April 1, 2015, a media outlet reported that RCPT was considering offers to be acquired. | Trader A profited approximately $4,596,159 from trading in CFDs in March and April 2015. Nikas profited approximately $85,416 from trading equities in April 2015. |
| Thoratec Corporation ("THOR") | On July 22, 2015, THOR announced that it had agreed to be acquired by St. Jude Medical, Inc. | Trader A profited approximately $2,862,038 from trading CFDs in July 2015. |
| Solera Holdings, Inc. ("SLH") | On September 13, 2015, SLH announced that it had agreed to be acquired by Vista Equity Partners, for $55.85 per share. | Trader A profited approximately $764,567 from trading CFDs and options in September 2015. Nikas profited approximately $400,871 from trading CFDs and equities in September 2015. |

93.     The above-referenced acquisitions of Onyx Pharmaceuticals and Avanir Pharmaceuticals contemplated an acquisition through means of a tender offer.

94.     At the time Windsor and/or Taylor tipped Trader A, and Trader A further tipped Nikas, regarding these tender offers, a substantial step or steps to commence each of the offers – including (depending on the specifics of the tender offer) negotiations, board meetings, the arrangement of financing, the hiring of advisors, and/or proposals – had been taken.

**E.     Taylor and Windsor Directly or Indirectly Tipped El-Khouri About Pharmacyclics, Hyperion and 4 Other Deals Advised by Investment Bank 2**

95.     On multiple occasions beginning in or about March 2015 through August 2015, Taylor, through an intermediary, tipped El-Khouri with material nonpublic information that Taylor obtained from Windsor, who misappropriated the information from Investment Bank 2.

96.     El-Khouri paid the intermediary for Taylor's tips, including hundreds of thousands in cash as well as funding luxury travel, such as boutique hotel stays and the charter of a yacht.  The intermediary, in turn, provided a portion of the funds from El-Khouri to Taylor.

**Pharmacyclics**

97.     In early 2015, Taylor, through an intermediary, tipped material nonpublic information to El-Khouri in connection with the March 4, 2015 announcement that AbbVie, Inc. had agreed to acquire Pharmacyclics, Inc. ("Pharmacyclics"), a biopharmaceutical company headquartered in California that traded on the NASDAQ under the ticker symbol PCYC.

98.     On February 19, 2015, Windsor—who was not staffed on the deal team at Investment Bank 2 regarding the Pharmacyclics acquisition—obtained access to an Investment Bank 2 presentation concerning the nonpublic merger discussions between Pharmacyclics and three potential acquirors.  The confidential document indicated that the three companies were

actively engaged in due diligence and were working to provide an indication of interest in acquiring Pharmacyclics by March 3, 2015.

99.     On or before March 4, 2015, Windsor tipped information about the potential acquisition to Taylor, who, through an intermediary, tipped that information to El-Khouri.

100.     On March 4, 2015, based on material nonpublic information misappropriated by Windsor, El-Khouri bought 5,000 Pharmacyclics CFDs through a brokerage account in London (the "El-Khouri London Account").

101.     On March 4, 2015, after the markets closed, Pharmacyclics and AbbVie announced that they had reached a merger agreement, whereby AbbVie would acquire all of the shares of Pharmacyclics for $261.25 per share, causing Pharmacyclics' share price to increase by approximately 10%.

102.     On March 5, 2015, El-Khouri sold the 5,000 CFDs he acquired the previous day, earning a profit of approximately $141,750.

**Hyperion**

103.     Similarly, in or about March 2015, Taylor obtained from Windsor and, through an intermediary, tipped to El-Khouri material nonpublic information about a potential corporate transaction involving Hyperion Therapeutics, Inc. ("Hyperion"), a Brisbane, California-based pharmaceutical company that traded on the NASDAQ under the ticker symbol HPTX.

104.     In mid-December 2014, Investment Bank 2 made a presentation at a Hyperion board of directors meeting, after which the Hyperion board agreed to work with Investment Bank 2 to further develop and refine the company's financial model and business plan.

105.     On January 9, 2015, Investment Bank 2 representatives attended a meeting of the Hyperion board of directors, during which Investment Bank 2 presented information about a potential transaction in which Hyperion would be acquired.

106.     Although Windsor was not assigned to work on Investment Bank 2's discussions with or provision of advice to Hyperion, she repeatedly accessed documents about Hyperion on Investment Bank 2's computer network from at least January 10 through February 9, 2015.

107.     On February 11, 2015, the CEO and CFO of Hyperion met with representatives of Horizon Pharma plc ("Horizon") in New York City.  During the meeting, the Horizon attendees expressed the company's interest in acquiring Hyperion.

108.     On March 3, 2015, Hyperion's CEO met with the CEO of a different pharmaceutical company that expressed interest in a possible corporate transaction with Hyperion.  Later that evening, Windsor accessed documents relating to Hyperion through Investment Bank 2's computer network, and did so again in the evening hours of Sunday, March 8, 2015 and Monday, March 9, 2015.  Among the documents accessed by Windsor between March 8 and March 9, 2015 was a list of potential buyers for Hyperion.

109.     On March 14, 2015 (a Saturday), Hyperion's CEO spoke with Horizon's CEO. Among other things, Hyperion's CEO confirmed that the board of directors was scheduled to meet on March 19, 2015 to consider Horizon's acquisition proposal, and that Hyperion intended to formally retain Investment Bank 2 as its financial advisor with regard to the proposed transaction.

110.     Also on March 14, 2015, Windsor accessed documents relating to Hyperion on Investment Bank 2's computer network.

111.     On or before Monday, March 16, 2015, Windsor tipped Taylor about the potential acquisition of Hyperion and Taylor, in turn, arranged to provide the information to El-Khouri.

112.     On March 16, 2015, on the basis of material nonpublic information misappropriated by Windsor, El-Khouri purchased 10,000 Hyperion CFDs in the El-Khouri London Account.

113.     On March 17, 2015, Hyperion executed a formal engagement letter with Investment Bank 2.  Also on March 17, 2015, Windsor accessed documents relating to Hyperion on Investment Bank 2's computer network.

114.     On March 19, 2015, as scheduled, Hyperion held a board meeting, which was also attended by representatives of Investment Bank 2.  Later that day, Hyperion provided Horizon and its legal and financial advisors access to an electronic data room.

115.     Again, despite not being assigned to work on Hyperion-related matters in any capacity, Windsor continued to access documents related to Hyperion at Investment Bank 2, including in the late evening hours of March 18, 2015, and then again on March 20, March 21, March 25, and March 26, 2015.

116.     Between March 17 and March 27, 2015, El-Khouri purchased and sold Hyperion CFDs, acquiring a total of 23,000 Hyperion CFDs in the El-Khouri London Account.

117.     On Sunday, March 29, 2015, Hyperion's board unanimously approved the merger transaction with Horizon.  On March 30, 2015, before the U.S. markets opened, Horizon and Hyperion announced that they had entered into a definitive agreement under which Horizon would acquire all of the shares of Hyperion's common stock via tender offer for $46.00 per share in cash (or approximately $1.1 billion on a fully diluted basis).

118.     On Monday, March 30, 2015, El-Khouri sold all 23,000 of his Hyperion CFDs for illicit profits of approximately $149,642.

119.     In addition, Taylor and Windsor directly or indirectly tipped El-Khouri, in the same or similar manner described above, about at least four other corporate transactions advised by Investment Bank 2.  While in possession of and based on material nonpublic information so misappropriated from Investment Bank 2, El-Khouri placed highly profitable trades as summarized in the chart below:

| Company/Ticker | Announcement/News | Profits |
|---|---|---|
| Omnicare, Inc. ("OCR") | On May 20, 2015 after the market closed, a media outlet reported that CVS was in advanced talks to buy OCR. | El-Khouri made a profit of approximately $295,580 from trading CFDs in April and May 2015. |
| Receptos, Inc. ("RCPT") | On the afternoon of April 1, 2015, a media outlet reported that RCPT was considering offers to be acquired. | El-Khouri acquired CFDs in March 2015. On the day after the news report, he had an unrealized profit of approximately $653,119. |
| Solera Holdings, Inc. ("SLH") | On September 13, 2015, SLH announced that it had agreed to be acquired by Vista Equity Partners, for $55.85 per share. | El-Khouri made a profit of approximately $563,681 from trading CFDs in August and September 2015. |
| EnerSys ("ENS") | On October 6, 2015, a media outlet reported that Johnson Controls International plc was in early discussions to acquire ENS. | El-Khouri made a profit of approximately $568,457 from trading CFDs in September and October 2015. |

120.    The above-referenced bids for Pharmacyclics and Hyperion Therapeutics contemplated an acquisition through means of a tender offer.

121.    At the time Taylor tipped an intermediary, and the intermediary further tipped El-Khouri, regarding these tender offers, a substantial step or steps to commence each of the offers – including (depending on the specifics of the tender offer) negotiations, board meetings, the arrangement of financing, the hiring of advisors, and/or proposals – had been taken.

# FIRST CLAIM FOR RELIEF
*Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder*
*(Taylor and Windsor)*

122.     The Commission re-alleges and incorporates by reference Paragraphs 1 through 121 above as if they were fully set forth herein.

123.     Windsor and Taylor provided, or caused to be provided, material nonpublic information to one or more tippees, including Trader A, Nikas and/or El-Khouri, knowing or having a reasonable expectation or recklessly disregarding that the tippee(s) would trade and/or tip others to trade on the basis of that information.  In each such instance, a reasonable investor would have viewed the information as being important to his or her investment decision.

124.     Taylor and Windsor had a duty to maintain the confidentiality of the material nonpublic information they tipped to others by virtue of their employment with Investment Bank 1 and Investment Bank 2 respectively.  Windsor and Taylor breached those duties by providing such material nonpublic information to others for use in connection with securities trading and in exchange for personal benefits or with the expectation of receiving a benefit.

125.     Taylor knew, was reckless in not knowing, should have known, or consciously avoided knowing that the material nonpublic information he obtained from Windsor was disclosed or misappropriated in breach of a fiduciary duty or obligation arising from a similar relationship of trust or confidence.  Taylor knew, should have known or recklessly disregarded that Windsor communicated such information to Taylor for, and with the expectation of receiving, a benefit.

126.     By engaging in the conduct described above, Taylor and Windsor, directly or indirectly, in connection with the purchase or sale of securities, by the use of means or instrumentalities of interstate commerce, or of the mails, with scienter:

> (a) employed devices, schemes, or artifices to defraud;

(b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and

(c) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons, including purchasers and sellers of securities.

127.    By reason of the actions alleged herein, Taylor and Windsor violated and, unless restrained and enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

**SECOND CLAIM FOR RELIEF**
*Violations of Section 14(e) of the Exchange Act and Rule 14e-3 Thereunder*
*(Taylor and Windsor)*

128.    The Commission re-alleges and incorporates by reference Paragraphs 1 through 121 above as if they were fully set forth herein.

129.    By engaging in the conduct described above, Taylor and Windsor, prior to the public announcement of tender offers by companies including Onyx Pharmaceuticals and Avanir Pharmaceuticals, and after a substantial step or steps to commence each of the tender offers had been taken, while in possession of material information relating to each of the tender offers, which information they knew or had reason to know was nonpublic and had been acquired directly or indirectly from the offering company, the issuer, or any officer, director, partner, or employee, or other person acting on behalf of the offering company or issuer, communicated material nonpublic information relating to each of the tender offers under circumstances in which it was reasonably foreseeable that the communication was likely to result in the purchase and sale of the securities sought or to be sought by such tender offers.

130.    By reason of the actions alleged herein, Taylor and Windsor violated and, unless restrained and enjoined, will continue to violate Section 14(e) of the Exchange Act [15 U.S.C. §

78n(e)] and Rule 14e-3 thereunder [17 C.F.R. § 240.14e-3].

## THIRD CLAIM FOR RELIEF
*Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder*
*(Nikas)*

131.    The Commission re-alleges and incorporates by reference Paragraphs 1 through 121 above as if they were fully set forth herein.

132.    Nikas traded securities while in possession, and on the basis, of material nonpublic information about the deals advised by Investment Bank 1 and Investment Bank 2 and provided by Trader A, including but not limited to: Life Technologies, Metals USA, AmerisourceBergen, Onyx Pharmaceuticals, Idenix Pharmaceuticals, InterMune, Avanir Pharmaceuticals, Omnicare, Receptos, and Solera Holdings.  In each such instance, Nikas knew or recklessly disregarded that the information provided was material and nonpublic.  Nikas also knew, recklessly disregarded, should have known, or consciously avoided knowing that such material nonpublic information had been conveyed or obtained in breach of a fiduciary duty or obligation arising from a similar relationship of trust or confidence.

133.    By engaging in the conduct described above, Nikas, directly or indirectly, in connection with the purchase or sale of securities, by the use of means or instrumentalities of interstate commerce, or of the mails, with scienter:

> (a) employed devices, schemes, or artifices to defraud;
>
> (b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and
>
> (c) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons, including purchasers and sellers of securities.

134.     By reason of the actions alleged herein, Nikas violated and, unless restrained and enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## FOURTH CLAIM FOR RELIEF
*Violations of Section 14(e) of the Exchange Act and Rule 14e-3 Thereunder*
*(Nikas)*

135.     The Commission re-alleges and incorporates by reference Paragraphs 1 through 121 above as if they were fully set forth herein.

136.     By engaging in the conduct described above, Nikas, prior to the public announcement of tender offers, including Onyx Pharmaceuticals and Avanir Pharmaceuticals, and after a substantial step or steps to commence each of the tender offers had been taken, while in possession of material information relating to the tender offers, which information he knew or had reason to know was nonpublic and had been acquired directly or indirectly from the offering company, the issuer, or any officer, director, partner, or employee, or other person acting on behalf of the offering company or issuer, purchased or caused to be purchased or sold or caused to be sold the securities sought or to be sought by such tender offers.

137.     By reason of the actions alleged herein, Nikas violated and, unless restrained and enjoined, will continue to violate Section 14(e) of the Exchange Act [15 U.S.C. § 78n(e)] and Rule 14e-3 thereunder [17 C.F.R. § 240.14e-3].

## FIFTH CLAIM FOR RELIEF
*Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder*
*(El-Khouri)*

138.     The Commission re-alleges and incorporates by reference Paragraphs 1 through 121 above as if they were fully set forth herein.

139.     El-Khouri traded securities while in possession, and on the basis, of material nonpublic information provided directly or indirectly by Taylor and Windsor, including but not

limited to Pharmacyclics, Hyperion Therapeutics, Omnicare, Receptos, Solera Holdings, and EnerSys. El-Khouri also knew, recklessly disregarded, should have known, or consciously avoided knowing that such material nonpublic information had been obtained or conveyed in breach of a fiduciary duty or obligation arising from a similar relationship of trust or confidence.

140. By engaging in the conduct described above, El-Khouri, directly or indirectly, in connection with the purchase or sale of securities, by the use of means or instrumentalities of interstate commerce, or of the mails, with scienter:

(d) employed devices, schemes, or artifices to defraud;

(e) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and

(f) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons, including purchasers and sellers of securities.

141. By reason of the actions alleged herein, El-Khouri violated and, unless restrained and enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## SIXTH CLAIM FOR RELIEF

*Violations of Section 14(e) of the Exchange Act and Rule 14e-3 Thereunder*
*(El-Khouri)*

142.     The Commission re-alleges and incorporates by reference Paragraphs 1 through 121 above as if they were fully set forth herein.

143.     By engaging in the conduct described above, El-Khouri, prior to the public announcement of tender offers, including Pharmacyclics and Hyperion Therapeutics, and after a substantial step or steps to commence each of the tender offers had been taken, while in possession of material information relating to the tender offers, which information he knew or had reason to know was nonpublic and had been acquired directly or indirectly from the offering company, the issuer, or any officer, director, partner, or employee, or other person acting on behalf of the offering company or issuer, purchased or caused to be purchased or sold or caused to be sold the securities sought or to be sought by such tender offers.

144.     By reason of the actions alleged herein, El-Khouri violated and, unless restrained and enjoined, will continue to violate Section 14(e) of the Exchange Act [15 U.S.C. § 78n(e)] and Rule 14e-3 thereunder [17 C.F.R. § 240.14e-3].

## **PRAYER FOR RELIEF**

WHEREFORE, the Commission respectfully requests that this Court enter a judgment:

### I.

Finding that Defendants Taylor, Windsor, Nikas, and El-Khouri violated Sections 10(b) and 14(e) of the Exchange Act [15 U.S.C. §§ 78j(b), 78n(e)] and Rules 10b-5 and 14e-3 thereunder [17 C.F.R. §§ 240.10b-5, 240.14e-3];

### II.

Permanently restraining and enjoining Defendants from violating Sections 10(b) and 14(e) of the Exchange Act [15 U.S.C. §§ 78j(b), 78(n)(e)] and Rules 10b-5 and 14e-3 thereunder [17 C.F.R. §§ 240.10b-5, 240.14e-3];

### III.

Ordering Taylor, Windsor, Nikas, and El-Khouri to disgorge, with prejudgment interest, all illicit trading profits or other ill-gotten gains received as a result of the actions alleged herein and within the relevant statute of limitations;

### IV.

Ordering Taylor, Windsor, Nikas, and El-Khouri to pay civil penalties pursuant to Section 21A of the Exchange Act [15 U.S.C. § 78u-l]; and

### V.

Granting such other and further relief as this Court may determine to be just and appropriate.

Dated: March 27, 2020

By: /s/ Rua M. Kelly
    Joseph G. Sansone
    Assunta Vivolo
    Caitlyn Campbell
    Michael D. Foster*
    Rua M. Kelly*
    U.S. Securities and Exchange Commission
    New York Regional Office
    200 Vesey Street, Suite 400
    New York, New York 10281-1022
    (617) 573-8941
    kellyru@sec.gov

    *Admitted *pro hac vice* in the S.D.N.Y.