**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

UNITED STATES SECURITIES AND
EXCHANGE COMMISSION,

       Plaintiff,

      v.

BENJAMIN TAYLOR, DARINA WINDSOR,
and JOSEPH ABDUL NOOR EL-KHOURI,

       Defendants.

**Civil Action No.  19-09744 (JLR)**


**SECURITIES AND EXCHANGE COMMISSION'S MEMORANDUM**
**IN SUPPORT OF MOTION FOR DEFAULT JUDGMENT**
**AS TO DEFENDANT JOSEPH ABDUL NOOR EL-KHOURI**

Rua M. Kelly
Michael D. Foster
Assunta Vivolo
Attorneys for Plaintiff
**Securities and Exchange Commission**
Boston Regional Office
33 Arch Street, 24th Floor
Boston, MA  02139
(617)-573-8941 (Kelly direct)
kellyru@sec.gov

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................................................... iii

INTRODUCTION .................................................................................................................. 1

PROCEDURAL BACKGROUND ........................................................................................... 2

FACTUAL BACKGROUND ................................................................................................... 4

DEFAULT JUDGMENT STANDARD ....................................................................................8

ARGUMENT ....................................................................................................................... 9

    I.     EL-KHOURI WAIVED SERVICE OF THE SUMMONS AND AMENDED COMPLAINT PURSUANT TO FRCP 4(d). ........................................................... 9

    II.    THE COMPLAINT ESTABLISHES EL-KHOURI'S LIABILITY FOR SECURITIES FRAUD.

          A.  El-Khouri Violated Exchange Act Section 10(b) and Rule 10b-5.....................9

          B.  El-Khouri Violated Exchange Act Section 14(e) and Rule 14e-3….....….....14

    III.   RELIEF TO BE IMPOSED FOR EL-KHOURI'S INSIDER TRADING VIOLATIONS.

          A.  El-Khouri Should Be Enjoined From Future Violations of Exchange Act Sections 10(b) and 14(e) and Rules 10b-5 and 14e-3 ……………………..……16

          B.  The Court Should Order El-Khouri to Disgorge His Ill-Gotten Trading Profits Plus Prejudgment Interest..................................................................................18

          C.  The Court Should Impose a Meaningful Civil Penalty to Penalize El-Khouri and Deter Others……………………………………………………………...19

CONCLUSION…………………………………………………………………………22

## TABLE OF AUTHORITIES

**Cases**

*Au Bon Pain Corp. v. Artect, Inc.*, 653 F.2d 61 (2d Cir. 1981)…………..………………………..…..8

*Basic, Inc. v. Levinson*, 485 U.S. 224 (1988)…...………………………………………………….12

*Bermudez v. Reid*, 733 F.2d 18 (2d Cir. 1984)………………………………………………………8

*Century Metal Recycling, Pvt., Ltd. v. Dacon Logistics, LLC*, No. 3:13-cv-93,
2014 WL 129409, (D. Conn. Jan. 13, 2014)…………………………………………………………8

*Dirks v. SEC*, 463 U.S. 646, 654 (1983)………………………………………….……………...9, 11, 12

*Drucker v. SEC*, 346 Fed. Appx. 666 (2d Cir. 2009)………………………………………………..21

*Ernst & Ernst* v. *Hochfelder*, 425 U.S. 185 (1976)………………………………………………...13

*Herman & MacLean v. Huddleston*, 459 U.S. 375 (1983)………………………………………….13

*Kee v. Hasty*, U.S. Dist. LEXIS 6385 (S.D.N.Y. Apr. 14, 2004)………………………………………8

*Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306 (1950)……………………………….9

*Salman v. United States*, 580 U.S. 39 (2016)………………………………………………………11

*SEC v. Airborne Wireless Network*, No. 21 Civ. 01772,
2024 WL 4891899 (S.D.N.Y. Nov. 26, 2024)………………………………………………………19

*SEC v. Anticevic*, No. 05-cv-6991, 2009 WL 4250508 (S.D.N.Y. Nov. 30, 2009)……………......8

*SEC v. Berrettini*, 218 F. Supp. 3d 754 (N.D. Ill. 2016)……………………………..………17, 21

*SEC v. Binette*, 679 F. Supp. 153 (D. Mass. 2010)…………………………………………......10

*SEC v. Cavanaugh*, 155 F.3d 129 (2d Cir. 1998)…………………………………………………17

*SEC v. Chappell*, 107 F.4th 114 (3d Cir. 2024)…………………………………………………16, 17

*SEC v. Cole*, No. 12-cv-8167, 2014 WL 4723306 (S.D.N.Y. Sept. 22, 2014)…………………….8

*SEC v. First Jersey Secs., Inc.*, 101 F.3d 1450 (2d Cir. 1996)……………………………………18

*SEC v. Freeman*, 290 F. Supp. 2d 401 (S.D.N.Y. 2003)…………………………….……………..18

*SEC v. Govil*, 86 F.4th 89 (2d Cir. 2023)……………………………………………………………18

*SEC v. Gunn*, No. 08-cv-1013, 2010 WL 3359465 (N.D. Tex. Aug. 25, 2010)…………..……..19

*SEC v. Haligiannis*, 470 F. Supp. 2d 373 (S.D.N.Y. 2007)………………………………………20

*SEC v. iFresh, Inc.*, No. 22-cv-3200, 2024 WL 416709 (E.D.N.Y. Feb. 5, 2024)……………….18

*SEC v. Lipson*, 278 F.3d 656 (7th Cir. 2002)……………………………………………………20

*SEC v. Mayhew*, 121 F.3d 44 (2d Cir. 1997)…………………………………………………14, 15

*SEC v. Mgmt. Dyn., Inc.*, 515 F.2d 801 (2d Cir. 1975)……………..…………………………........8

*SEC v. Materia*, 745 F.2d 197 (2d Cir. 1984)………………………………………………………12

*SEC v. Melvin*, No. 12-cv-2984, 2017 WL 11696403 (N.D. Ga. June 22, 2017)………………..21

*SEC v. Morano*, No. 18-cv-00386, 2019 WL 1440262 (D. Or. Apr. 1, 2019)……………………21

*SEC v. Musella*, 578 F. Supp. 425 (S.D.N.Y. 1984)……………………………………….…….15

*SEC v. O'Brien*, 23-1071 (summary order), 2024 WL 2813722 (2d Cir. Jun. 3, 2024)…………..19

*SEC v. Obus*, 693 F.3d 276 (2d Cir. 2012)……………………………………...………9, 10, 11

*SEC v. One or More Unknown Traders in the Common Stock of Certain Issuers*,
No. 08-cv-1402, 2009 WL 3233110 (E.D.N.Y. 2009)…………….………………...……17, 19

*SEC v. Platforms Wireless Int'l Corp.*, 617 F.3d 1072 (9th Cir. 2010)………………………….18

*SEC v. Rajaratnam*, 822 F. Supp. 2d 432 (S.D.N.Y. 2011)…………………………………….20

*SEC v. Rajaratnam*, 918 F.3d 36 (2d Cir. 2019)……………………………………………….20

*SEC v. Rinfret*, No. 19-cv-6037, 2020 WL 6559411 (S.D.N.Y. Nov. 9, 2020)……………..……8

*SEC v. Singer*, 786 F. Supp. 1158 (S.D.N.Y. 1992)…………………………………………….13

*SEC v. Suman*, 684 F. Supp. 2d 378 (S.D.N.Y. 2010)…………………………………………17

*SEC v. Svoboda*, 409 F. Supp. 2d 331 (S.D.N.Y. 2006)……………………………………….14

*SEC v. U.S. Envt., Inc.*, 155 F.3d 107 (2d Cir. 1998). ……………………………………….13

*SEC v. Waldman*, No. 17-cv-2088, 2019 WL 5791788 (S.D.N.Y. July 29, 2019)……………13

*Starbucks v. McKinney*, 144 S. Ct. 1570 (2024)………………………………………16

*United States v. Corbin*, 729 F. Supp. 2d 607 (S.D.N.Y. 2010)……...…………………………12

*United States v. Di Mucci*, 879 F.2d 1488 (7th Cir. 1989)…………………………………….19

*United States v. Falcone*, 257 F.3d 226 (2d Cir. 2001)………………………………………..11

*United States v. Finkelstein*, 229 F.3d 90 (2d Cir. 2000)……………………………………….13

*United States v. Newman*, 773 F. 3d 438 (2d Cir. 2014) …………………………………….11

*United States v. O'Hagan*, 521 U.S. 642 (1997)………….……………………………10, 14

*United States v. Svoboda*, 347 F.3d 471 (2d Cir. 2003)………………………………………13

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008)………………………………………16

**Statutes**

15 U.S.C. § 78j(b)……………………………………………………………………………….9

15 U.S.C. § 78n(e)…………………………………………………………………………….14

15 U.S.C. § 78u(d)……………………………………………………...……………16, 18

15 U.S.C. § 78u-1……………………………………………………………………...……19

**Regulations**

17 C.F.R. § 240.10b-5……………………………………………………………………10

17 C.F.R. § 240.10b5-1(b)………………………………………………………..11

17 C.F.R. § 240.14e-3…………………………………………………………14

**Rules**

Fed. R. Civ. P. 55…………………………………………………..………………1, 8

Fed. R. Civ. P. 4…………………………………………………………………9

# INTRODUCTION

Pursuant to Federal Rule of Civil Procedure 55(b)(2) and Local Rule 55.2(b), plaintiff Securities and Exchange Commission ("Commission") respectfully submits this memorandum of law in support of its motion for default judgment against defendant Joseph Abdul Noor El-Khouri ("El-Khouri").  The Commission seeks a default judgment because El-Khouri has waived service of the summons and Amended Complaint and he has failed to plead or otherwise defend this action.

As set forth in greater detail in the Amended Complaint, El-Khouri participated in an international insider trading scheme that netted its participants tens of millions of dollars in illicit profits.  El-Khouri joined the scheme in at least early 2015 when he began to receive tips of material nonpublic information through an intermediary trafficking in information misappropriated by investment bankers Benjamin Taylor ("Taylor") and Darina Windsor ("Windsor") concerning prospective mergers and acquisitions involving corporate clients of their respective employers.  Between March 2015 and October 2015, El-Khouri repeatedly used such inside information to establish profitable "long" positions in such companies by purchasing derivative financial instruments (CFDs) based on securities listed on U.S. exchanges.  He did so with knowledge, or at least with reckless disregard or conscious avoidance, that the information had been obtained and transmitted improperly.  Indeed, El-Khouri paid kickbacks from the illegal securities transactions to the intermediary who, in turn, shared a portion of the proceeds with Taylor and Windsor.

The Commission now moves the Court to enter a default judgment that finds El-Khouri violated Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 thereunder, as well as Section 14(e) of the Exchange Act and Rule 14e-3 thereunder, and

permanently enjoins him from future violations of those provisions, as well as imposing

disgorgement in the amount of $2,372,229, with prejudgment interest thereon in the amount of

$587,452, and civil penalty in the amount of $4,744,458.

## PROCEDURAL BACKGROUND

On October 22, 2019, the Commission filed a complaint against Taylor, Windsor, and El-

Khouri, alleging that the defendants violated federal securities law by participating in an

international insider trading scheme, and that Taylor and Windsor carried out the scheme by

misappropriating material nonpublic information concerning impending corporate transactions

and directly or indirectly tipping such information to others, including El-Khouri, who used it to

trade securities. *See* Dkt. No. 1. On March 27, 2020, the Commission filed an amended

complaint (the "Amended Complaint"), alleging additional instances of insider trading and

adding a fourth defendant, George Nikas ("Nikas"). *See* Dkt. No. 15. All four defendants were

alleged to reside outside of the United States: Taylor in France, Windsor in Thailand, Nikas in

Greece, and El-Khouri in the United Kingdom. *Id*.

On May 19, 2020, the Court issued summonses for all four defendants. *See* Dkt. Nos. 20-

23. On October 1, 2020, El-Khouri waived service of the summons through his U.S.-based

counsel. *See* Dkt. No. 26 (attached as Exhibit A to the Declaration of Rua M. Kelly filed in

support of this motion). In waiving service of the summons, El-Khouri acknowledged that he

"must file and serve an answer or motion under Rule 12 within 60 days from 09/17/2020, the

date when this request was sent (or 90 days if it was sent outside the United States)." *Id*. El-

Khouri further acknowledged in the waiver form that if he failed to respond to the complaint, "a

default judgment will be entered[.]" *Id*. On January 26, 2021, the civil case against El-Khouri

was stayed on the motion of the USAO.[1] *See* Dkt. No. 26.  Shortly before entry of the stay as to

El-Khouri, on December 16, 2020, the Court entered judgment as to Nikas pursuant to the

parties' negotiated settlement. *See* Dkt. No. 28.  On May 18, 2022, Windsor was served with the

Amended Complaint in Thailand.  On December 2, 2022, Taylor was served with the Amended

Complaint in France.  On March 2, 2023, the case against Taylor was stayed on the motion of the

USAO with the consent of Taylor's counsel. *See* Dkt. Nos. 45-48.  On November 29, 2023, the

court granted the Commission's motion for default judgment as to Windsor but stayed any ruling

on monetary relief pending the resolution of the claims against Taylor. *See* Dkt. No. 66.

The civil action against both Taylor and El-Khouri remained stayed until March 21,

2025, after the Supreme Court of the United Kingdom quashed El-Khouri's order of extradition.

*See* https://supremecourt.uk/uploads/uksc_2023_0127_press_summary_d2202913ef.pdf

(summary of Court's opinion granting El-Khouri's appeal and finding that all relevant conduct

occurred outside of the United States). *See* Dkt. No. 79 (lifting stay).  Upon lifting the stay, the

Court ordered the parties to appear for an April 2, 2025 conference; counsel for the Commission

and Taylor appeared at the conference, but El-Khouri did not appear, nor did counsel appear on

his behalf. *See* Transcript, *SEC v. Taylor et. al.*, 19 Civ. 9744 (JLR) (4/2/25) (attached as Exhibit

B to the Declaration of Rua M. Kelly filed in support of this motion).  After counsel for the

Commission noted at the April 2 conference that "Mr. El-Khouri … is not here," the Court "set

down the deadline for responding to the complaint for all defendants for May 6." *Id*. at pp. 3, 5.

---

[1] All four defendants have been indicted in parallel criminal cases in this District. *See United States v. Joseph El-Khouri*, 19-cr-00652 (JGK) (filed Sept. 9, 2019); *United States v. George Nikas*, 19-cr-00716 (DLC) (filed Oct. 7, 2019); *United States v. Benjamin Taylor and Darina Windsor*, 18-cr-00184 (DLC) (filed March 5, 2018).

As the court docket reflects, El-Khouri failed to file an answer or any responsive pleading before, on, or after May 6, 2025, nor did he seek an extension of the deadline from the Court.

On May 13, 2025, the Court issued an order stating that the "Commission shall file a proposed clerk's certificate of default with respect to El-Khouri." *See* Dkt. No. 89. On May 14, 2025, the clerk's office for the Southern District of New York issued a certificate of default as to El-Khouri pursuant to Federal Rule of Civil Procedure 55(a), and as requested by the Commission. *See* Dkt. No. 93.

## FACTUAL BACKGROUND

The insider trading scheme alleged in the Amended Complaint began in late 2012. *See* Dkt. No. 15, Amended Complaint at ¶¶1-3. Defendants Taylor and Windsor met in 2010 when they worked together at an investment bank ("Investment Bank 1") in London. *Id.* at ¶21. Windsor left Investment Bank 1 in or about September of 2012, and began working in a similar capacity in the London office of Investment Bank 2. *Id.* at ¶22. In the course of their employments as investment bankers, Taylor and Windsor had access to confidential and commercially sensitive information about publicly traded companies, and both were subject to specific policies and procedures geared toward ensuring confidentiality of nonpublic information and preventing its misuse for personal gain. *Id.* at ¶¶24-25. By at least early 2013, Taylor and Windsor began tipping material nonpublic information about corporate clients of their respective banks to a chain of tippers and/or traders—which included a trader based in Switzerland ("Trader A"), his friend (defendant Nikas), and later El-Khouri—in exchange for a share of illegal profits generated from trading around news of mergers, acquisitions, and other significant transactions of such public companies. *Id.* at ¶¶27-33.[2]

---

[2] While the Commission's Amended Complaint in this action does not identify Trader A by name, his identity, Marc Demane Debih ("Debih"), has been disclosed in other civil and criminal

On numerous occasions between approximately March 2015 and August 2015, Taylor, through an intermediary (the "Middleman"), tipped El-Khouri with material nonpublic information that Taylor obtained from Windsor, who misappropriated the information from Investment Bank 2. *Id*. at ¶95. El-Khouri paid the Middleman for these tips, including hundreds of thousands in cash as well as funding luxury travel, such as boutique hotel stays and the charter of a yacht. *Id*. at ¶96. The Middleman, in turn, provided a portion of the funds from El-Khouri to Taylor and Windsor. *Id*. During the relevant timeframe, Windsor misappropriated material nonpublic information from Investment Bank 2 related to corporate transactions (including potential acquisitions) involving the following companies, among others: (1) Pharmacyclics, Inc., (2) Hyperion Therapeutics, Inc. ("Hyperion"), (3) Omnicare, Inc., (4) Receptos, Inc., (5) Solera Holdings, Inc. ("Solera"), and (6) EnerSys. *Id*. at ¶¶62-121. Notably, Pharmacyclics and Hyperion were involved in discussions contemplating an acquisition through means of a tender offer, and at the time that El-Khouri traded in Pharmacyclics and Hyperion on the information misappropriated by Windsor, a substantial step or steps had been taken by those companies to commence each of the offers. *Id*. at ¶¶103-121.

El-Khouri generated millions in illegal profits as a result of the tips from Windsor and Taylor. Both the timing of El-Khouri's trades and the consistency of his profits were

---

proceedings. On October 21, 2019, securities fraud related indictments obtained by the USAO against Taylor and El-Khouri were unsealed in Case No. 18-cr-00184. On January 6, 2020, under the same case number, a 38-count indictment was unsealed that charged Debih with, among other things, conspiracy to commit securities fraud and securities fraud. *See* Case No. 18-cr-00184-DLC-3, Dkt. No. 25. Debih pled guilty to all 38 counts of his criminal indictment and, on December 13, 2021, was sentenced by the Honorable Denise L. Cote to time served, two years of supervised release, a $3,800 special assessment, $186,430.99 in restitution, and forfeiture of $49,000,000. *Id*., Dkt. No. 44. The Commission previously filed a parallel civil action against Debih and, on May 23, 2023, obtained a final judgment by consent. *See* Case No. 21-cv-10138-LAP, Dkt. No. 10.

remarkable. For example, on March 4, 2015, El-Khouri bought 5,000 Pharmacyclics contracts-for-difference ("CFDs")[3] through an account in London. *Id*. at ¶100. Pharmacyclics was then a biopharmaceutical company headquartered in California that traded on the NASDAQ. *Id*. at ¶97. That same day, after the markets closed in the United States, Pharmacyclics announced a merger agreement with the company AbbVie, Inc. *Id*. at ¶101. El-Khouri liquidated his position on March 5, generating more than $140,000 in illicit trading profits within a single business day. *Id*. at ¶102. Windsor (through Taylor) tipped the Middleman (who then tipped El-Khouri) on or before March 4, 2015 with material nonpublic information about the still-secret merger discussions between Pharmacyclics and three potential acquirors, including the fact that the potential acquirors had to indicate interest in acquiring Pharmacyclics by March 3, 2015. *Id*. at ¶98-99. Windsor, who was not staffed on the Pharmacyclics' deal team, knew all of this information because she obtained access to her employer's presentation concerning the potential acquisition of Pharmacyclics. *Id*. at ¶98.

This same basic sequence of events played out again just a few weeks later with respect to the March 30, 2015 market moving news of Hyperion's acquisition by Horizon Pharma plc ("Horizon"). *See id*. ¶¶103-118. Despite not being assigned to the Hyperion deal team, Windsor repeatedly accessed documents relating to the transaction on Investment Bank 2's computer network (*id*. ¶¶106, 108, 110, 115); she then passed (via intermediaries) material nonpublic information about Hyperion's prospective acquisition to El-Khouri (*id*. ¶111); who promptly began trading Hyperion CFDs (*id*. ¶¶112, 116); and exited his positions for illicit profits of

---

[3] A contract-for-difference is an agreement between two parties to exchange the difference in value of an underlying stock between the time the contract is opened and the time at which it is closed. CFDs are not traded in the United States but are traded based on securities listed on U.S. exchanges, including NYSE and NASDAQ. Amended Complaint at ¶¶16-17.

almost $150,000 on the day of the public announcement that Horizon would acquire all of the shares of Hyperion's common stock via tender offer (*id.* ¶118).

In total, El-Khouri generated more than $2.3 million in illicit trading profits from the tips he received from the Middleman, as summarized below. *See id.* at ¶119.

| Company/Ticker | Announcement/News | Profits |
|---|---|---|
| Pharmacyclics (PCYC) | On March 4, 2015, Pharmacyclics and AbbVie announced a merger agreement, whereby AbbVie would acquire all Pharmacyclics shares for $261.25 per share, causing Pharmacyclics' share price to increase by approximately 10%. | On March 5, 2015, El-Khouri sold his 5,000 CFD position (acquired on March 4, 2015), earning profits of approximately $141,750. |
| Hyperion (HPTX) | On March 30, 2015, before the U.S. markets opened, Horizon and Hyperion announced a definitive agreement under which Horizon would acquire all of Hyperion's common stock via tender offer for $46.00 per share in cash. | On March 30, 2015, El-Khouri sold his 23,000 CFD position (acquired between March 17-27, 2025), earning profits of approximately $149,642. |
| Omnicare (OCR) | On May 20, 2015 after the market closed, a media outlet reported that CVS was in advanced talks to buy OCR. | El-Khouri made a profit of approximately $295,580 from trading CFDs in April and May 2015. |
| Receptos (RCPT) | On the afternoon of April 1, 2015, a media outlet reported that RCPT was considering offers to be acquired. | El-Khouri acquired CFDs in March 2015. On the day after the news report, he had an unrealized profit of approximately $653,119. |
| Solera (SLH) | On September 13, 2015, SLH announced that it had agreed to be acquired by Vista Equity Partners, for $55.85 per share. | El-Khouri made a profit of approximately $563,681 from trading CFDs in August and September 2015. |
| EnerSys (ENS) | On October 6, 2015, a media outlet reported that Johnson Controls International plc was in early discussions to acquire ENS. | El-Khouri made a profit of approximately $568,457 from trading CFDs in September and October 2015. |
| | **Total El-Khouri profits:** | **$2,372,229** |

## DEFAULT JUDGMENT STANDARD

The entry of a default judgment is left to the "sound judicial discretion" of the court. 10A Wright, Miller, & Kane, FEDERAL PRACTICE AND PROCEDURE CIVIL 2D § 2685. Where, as here, a party fails to respond to an action, the court is ordinarily justified in entering a judgment against the defaulting party. *SEC v. Anticevic*, No. 05-cv-6991, 2009 WL 4250508, at *2 (S.D.N.Y. Nov. 30, 2009) (*citing Bermudez v. Reid*, 733 F.2d 18, 21 (2d Cir. 1984)). To enter a default judgment, however, the court must have "jurisdiction over the party against whom the judgment is sought, which also means that [the defendant] must have been effectively served with process*." Kee v. Hasty*, 2004 U.S. Dist. LEXIS 6385, at *13-14 (S.D.N.Y. Apr. 14, 2004).

In determining whether to enter a default judgment, the court should accept as true all of the factual allegations in the Complaint, except those relating to damages. *See Au Bon Pain Corp. v. Artect, Inc.*, 653 F.2d 61, 65 (2d Cir. 1981); *SEC v. Cole*, No. 12-cv-8167, 2014 WL 4723306, at *2 (S.D.N.Y. Sept. 22, 2014). The Commission is "also entitled to all reasonable inferences from the evidence offered." *Au Bon Pain*, 653 F.2d at 65. Though it must accept factual admissions, the court should determine whether the well-pled allegations legally establish defendant's liability. *See SEC v. Rinfret*, 19-cv-6037, 2020 WL 6559411, at *2 (S.D.N.Y. Nov. 9, 2020); *Century Metal Recycling, Pvt., Ltd. v. Dacon Logistics, LLC*, No. 3:13-cv-93, 2014 WL 129409, at *2 (D. Conn. Jan. 13, 2014). The court must then make an independent assessment with respect to remedies when deciding a motion for default judgment. Fed. R. Civ. P. 55(b); *see SEC v. Mgmt. Dyn., Inc.*, 515 F.2d 801, 814 (2d Cir. 1975).

<u>**ARGUMENT**</u>

## I. EL-KHOURI WAIVED SERVICE OF THE SUMMONS AND AMENDED COMPLAINT PURSUANT TO FRCP 4(d).

Since El-Khouri resided outside of the United States when the Amended Complaint was filed, the Commission was not required to serve the summons and complaint within 90 days of filing. *See* Fed. R. Civ. P. 4(m) (noting that the 90-day time limit for service "does not apply to service in a foreign country under Rule 4(f)"); *see also* Amended Complaint at ¶15 ("El-Khouri … is a Lebanese national who resides in Monaco and in London"). El-Khouri subsequently "waive[d] any objections to the absence of a summons or of service" and acknowledged that if he failed to timely respond to the Amended Complaint, a default judgment would be entered against him. *See* Kelly Decl. ¶4; Dkt. No. 26 (waiver of service). Given these circumstances, the Federal Rules of Procedure and due process have been satisfied. *See Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950) (service need only be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections").

## II. THE COMPLAINT ESTABLISHES EL-KHOURI'S LIABILITY FOR SECURITIES FRAUD.

### A. El-Khouri Violated Exchange Act Section 10(b) and Rule 10b-5.

Section 10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder prohibit fraud in connection with the purchase or sale of securities. *See* 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5. Insider trading is well established as a violation of Section 10(b) and Rule 10b-5. *See Dirks v. SEC*, 463 U.S. 646, 654 (1983); *SEC v. Obus*, 693 F.3d 276, 284 (2d Cir. 2012). Under the "misappropriation" theory of insider trading, "a person commits fraud 'in connection with' a securities transaction, and thereby violates §10(b) and Rule 10b-5, when he misappropriates

confidential information for securities trading purposes, in breach of a duty owed to the source of the information." *United States v. O'Hagan*, 521 U.S. 642, 653-54 (1997).[4]  The misappropriation theory "is designed to provide protection against corporate 'outsiders' who may access confidential information which would have an effect on the corporation's securities prices if revealed." *SEC v. Binette*, 679 F. Supp. 2d 153, 159 (D. Mass. 2010).  The undisclosed use of such confidential corporate information by an outsider "deceives the source of the information and simultaneously harms … the investing public." *O'Hagan*, 521 U.S. at 656.  The informational advantage gained through misappropriation "stems from contrivance" and cannot be overcome by other investors through research or skill. *Id*. at 658.  The misappropriation theory is thus "well tuned to an animating purpose of the Exchange Act: to insure honest securities markets and thereby promote investor confidence." *Id*.

Where, as here, the insider trading involves a tipping chain, "which [is] not uncommon," liability against a tippee can be proven by showing that:

    (a) the original tipper (here, *Windsor*) breached a duty by tipping confidential information;

    (b) the tippee (here, *El-Khouri*) knew or had reason to know that the tippee improperly obtained the information (*i.e.*, that the information was obtained through the tipper's breach); and

    (c) the tippee, while aware of the material non-public information, used that information by trading or by tipping for his own benefit.

---

[4] There are two actionable theories of insider trading liability: the "classical" theory, and the "misappropriation" theory.  The former theory applies when a corporate *insider* trades in his or her corporation's securities based on material nonpublic information, in violation of the recognized duty of "trust and confidence" insiders owe to shareholders. *O'Hagan*, 521 U.S. at 651-52.  The latter theory applies when a corporate *outsider* misappropriates confidential information for trading purposes, in breach of a similar duty owed to the source of the information (often an insider). *Id*. at 652.  Under either theory, liability also extends to a person who, rather than trading, "tips" someone else to trade on material nonpublic information, and to the "tippee" who trades knowing (or having reason to know) the information was confidential and disseminated in violation of a fiduciary or similar duty. *See, e.g., Obus*, 693 F.3d at 285.

*Obus*, 693 F.3d at 288-89; *see also Dirks*, 463 U.S. at 660; *United States v. Falcone*, 257 F.3d 226, 231 (2d Cir. 2001); 17 C.F.R. § 240.10b5-1(b) ("a purchase or sale of a security of an issuer is 'on the basis of' material nonpublic information . . . if the person making the purchase or sale was aware of the material nonpublic information when the person made the purchase or sale"). To be clear, the Commission is not required to show that El-Khouri owed, and traded in breach of, a duty to anyone, such as Taylor, Windsor, or Investment Bank 2 (the source of the material-nonpublic information), in order to prove that El-Khouri violated the securities laws. Rather, it is sufficient for liability that El-Khouri knew, was reckless in not knowing, or consciously avoided knowing that he traded on the basis of information received through a breach of duty by someone else (here, Windsor) for some personal benefit. *See United States v. Newman*, 773 F. 3d 438, 449 & n.3 (2d Cir. 2014) (tippee "does not need to know the details of the [tipper]'s disclosure of information," does "not have to know for certain how information was disclosed," "nor the identity of the insiders," so long as the tippee knew confidential information had been divulged for personal benefit), *overruled on other grounds by Salman v. United States*, 580 U.S. 39 (2016); *Obus*, 693 F.3d at 288-89 ("[c]hain tippee liability may also result from conscious avoidance" or recklessness).

Windsor owed a duty of trust and confidence to Investment Bank 2, as she explicitly agreed to maintain the confidentiality of material nonpublic information she was privy to during the course of her employment. Amended Complaint at ¶¶5, 25. She breached that duty by tipping material nonpublic information to Taylor for the express purpose of further dissemination to traders who would utilize the information for profit, with the expectation she would share in the proceeds (which she did). *Id*. at ¶¶27-30, 34. Indeed, Windsor repeatedly accessed internal electronic files of Investment Bank 2 for deals on which she was not even staffed and for which

she had no business reason to review, in furtherance of the insider trading scheme. *Id.* at ¶¶25, 80, 81, 98, 106.  The Middleman and, in turn, El-Khouri essentially inherited Windsor's duty. *See, e.g., Salman*, 580 U.S. at 42 ("tippee acquires the tipper's duty to disclose or abstain from trading"); *Dirks*, 463 U.S. at 664 ("There must be a breach of the insider's fiduciary duty before the tippee inherits the duty to disclose or abstain.").  In granting the Commission's motion for default judgment against Windsor, this Court has already found that Windsor, for her own benefit, provided, or caused to be provided, material nonpublic information to various tippees, including El-Khouri, knowing or recklessly disregarding that the tippees would trade and/or tip others to trade on the basis of that information. *See* Dkt. No. 66 (entering default judgment against Windsor on liability and enjoining future securities law violations).

The information supplied by Windsor and tipped to El-Khouri was categorically material. *See, e.g.*, *SEC v. Materia*, 745 F.2d 197, 199 (2d Cir. 1984) ("Because even a hint of an upcoming tender offer may send the price of the target company's stock soaring, information regarding the identity of a target is extremely sensitive and zealously guarded"); *United States v. Corbin*, 729 F. Supp. 2d 607, 609 (S.D.N.Y. 2010) (information secretly obtained from investment banker by day traders about impending acquisitions of publicly-traded companies was material).  Information is material if there is a substantial likelihood that the disclosure of that information would be viewed by a reasonable investor as having significantly altered the "total mix" of information made available. *Basic v. Levinson*, 485 U.S. 224, 231-32 (1988). Windsor worked at an investment bank that advised public companies considering or actively engaged in merger and acquisition activity.  The market reaction alone to the announcements regarding these companies—such as Pharmacyclics, which saw its share price rise 10% in a single day after the March 4, 2015 merger announcement (*see* Amended Compl. at ¶101)—

demonstrates that the information was viewed by the reasonable investor as having significantly altered the total mix of information available.

Finally, El-Khouri engaged in this conduct with scienter. Scienter is an element of violations of Section 10(b) of the Exchange Act, and Rule 10b-5 thereunder. *Ernst & Ernst* v. *Hochfelder*, 425 U.S. 185, 193 n.12 (1976) (scienter is a "mental state embracing the intent to deceive, manipulate or defraud"); *SEC v. U.S. Envt., Inc.*, 155 F.3d 107, 111 (2d Cir. 1998) (recklessness is sufficient for scienter); *see also United States v. Svoboda*, 347 F.3d 471, 480 (2d Cir. 2003) ("knowledge consciously avoided is the legal equivalent of knowledge actually possessed"); *United States v. Finkelstein,* 229 F.3d 90, 95 (2d Cir. 2000) ("one who deliberately avoided knowing the wrongful nature of his conduct is as culpable as one who knew"). El-Khouri's deliberate participation in a multi-faceted scheme to profit on unlawfully obtained corporate information is evident from not only his repetitive, extremely well-timed trading in advance of news of potential or agreed-to transactions advised by Investment Bank 2, which trading coincided with Windsor's internal access of deal-related documents, but also his provision of cash and other benefits to the Middleman as quid pro quo for this valuable inside information. *See SEC v. Waldman*, No. 17-cv-2088, 2019 WL 5791788, at *8 (S.D.N.Y. July 29, 2019) (finding triable issue of fact on scienter where evidence adduced by the SEC showed that the defendants ignored red flags that the tip resulted from insiders breaching their duties); *SEC v. Michel*, 521 F.Supp.2d 795, 826 (N.D. Ill. 2007) (trading patterns relevant to scienter).[5]

---

[5] The law does not require direct evidence of scienter. As the Supreme Court has held, "proof of scienter required in fraud cases is often a matter of inference from circumstantial evidence." *Herman & MacLean v. Huddleston*, 459 U.S. 375, 390 n.30 (1983). This is especially true in insider trading cases: "[p]roof of insider trading can well be made through an inference from circumstantial evidence and not solely upon a direct testimonial confession." *SEC v. Singer*, 786 F. Supp. 1158, 1164 (S.D.N.Y. 1992) (internal citations omitted).

In sum, the Amended Complaint's allegations, taken as true and with all reasonable inferences drawn in the Commission's favor, establish that El-Khouri traded securities while aware, and on the basis, of material nonpublic information regarding Pharmacyclics, Hyperion, Omnicare, Receptos, Solera, and Enersys. Further, El-Khouri knew, recklessly disregarded, or consciously avoided knowing that such material information had been obtained or conveyed in breach of a fiduciary duty or similar obligation from a similar relationship of trust or confidence for a personal benefit. El-Khouri is thus liable on the Fifth Claim for Relief of the Amended Complaint.

### B. El-Khouri Violated Exchange Act Section 14(e) and Rule 14e-3.

El-Khouri is also liable for violating Section 14(e) of the Exchange Act and Rule 14e-3 thereunder. 15 U.S.C. § 78n(e); 17 C.F.R. § 240.14e-3. Section 14(e) is a "broad antifraud remedy in the area of tender offers," and the accompanying Rule 14e-3 "imposes liability on persons who trade on material, nonpublic information in connection with a tender offer without regard to whether the trader owes a fiduciary duty with respect to the confidentiality of the information." *SEC v. Mayhew*, 121 F.3d 44, 49, 53 (2d. Cir. 1997). "A defendant violates Rule 14e–3(a) 'if he trades on the basis of material nonpublic information concerning a pending tender offer that he knows or has reasons to know has been acquired "directly or indirectly" from an insider of the offeror or issuer, or someone working on their behalf.'" *SEC v. Svoboda*, 409 F. Supp. 2d 331, 341 (S.D.N.Y. 2006) (quoting *O'Hagan*, 521 U.S. at 669). In order for Section 14(e) liability to attach to El-Khouri's insider trading, the Commission thus must prove three additional elements: *first*, that "substantial steps to commence" a tender offer had been taken before El-Khouri traded; *second*, that El-Khouri's material, non-public information was "relating to such tender offer"; and *third*, that El-Khouri knew or had reason to know that he received the

information from the offeror, offeree, or someone working on their behalf. 17 C.F.R. § 240.14e-3(a); *see also SEC v. Musella*, 578 F. Supp. 425, 443 (S.D.N.Y. 1984) (specifying elements of Rule 14e-3 claim). Meetings between the parties regarding the potential tender offer, retention of outside experts, and execution of consulting, confidentiality, or other preliminary agreements are all "substantial steps" towards a tender offer. *See Mayhew*, 121 F.3d at 53.

El-Khouri violated Section 14(e) of the Exchange Act and Rule 14e-3 when he bought CFDs in Pharmacyclics and Hyperion based on material nonpublic information regarding those entities' involvement in pending tender offers. *See* Amended Compl. at ¶¶97-102 (Pharmacyclics) and ¶¶103-119 (Hyperion). In both cases, El-Khouri's trading occurred after the companies had taken "substantial steps to commence" the tender offer, including the retention of Windsor's employer, Investment Bank 2. By the time El-Khouri bought Pharmacyclics CFDs on March 4, 2015, the company had three potential acquirors actively engaged in due diligence and working to provide an indication of interest by a deadline of March 3, 2015. *See id*. at ¶98. As to Hyperion, the CEO shared a list of potential buyers with Investment Bank 2 no later than March 8, 2015; the company then executed a formal engagement letter with Investment Bank 2 on March 17, 2015, and provided Horizon (the eventual acquiror) and its legal and financial advisors access to an electronic data room on March 19, 2015. *See id*. at ¶¶108, 113-114. El-Khouri began building his CFD position in Hyperion on March 16, 2015 and continued to buy and sell Hyperion CFDs through March 27, 2015, eventually selling his entire position on March 30, 2015 after Hyperion had announced the transaction with Horizon plc (for $46.00/share in cash).

El-Khouri knew, or certainly had reasons to know, that he was receiving inside information from the tender offeror, offeree, or someone working on their behalf. Indeed, El-

Khouri was paying substantial sums of money to the same source for these tips.  It is reasonable to infer that he knew or had reasons to know, that the ultimate source of the information was someone close to the company's negotiations.  Thus, El-Khouri's conduct violated Exchange Act Section 14(e) and Rule 14e-3.

## III.   RELIEF TO BE IMPOSED FOR EL-KHOURI'S INSIDER TRADING VIOLATIONS.

### A.   El-Khouri Should Be Enjoined from Future Violations of Exchange Act Sections 10(b) and 14(e) and Rules 10b-5 and 14e-3.

Section 21(d) of the Exchange Act expressly authorizes the Commission to seek injunctive relief. *See* 15 U.S.C. § 78u(d).  To obtain a permanent injunction against future violation of the securities laws, the Commission must demonstrate the following factors: that (1) the Commission has actually succeeded on the merits, (2) irreparable harm will likely result in the absence of the injunction, (3) the balance of the equities tips in the Commission's favor, and (4) the injunction is in the public interest. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 32 (2008) (factors pertinent in assessing preliminary or permanent injunctive relief); *see also Starbucks v. McKinney*, 144 S. Ct. 1570, 1576 (2024) (noting that "[w]hen Congress empowers courts to grant equitable relief, there is a strong presumption that courts will exercise that authority in a manner consistent with traditional principles of equity," which, with regard to injunctive relief, includes using "the traditional four-part test" set forth in *Winter*); *SEC v. Chappell*, 107 F.4th 114 (3d Cir. 2024) (applying *Starbucks* to a Commission enforcement action).

Each of the four factors supports injunctive relief here.  *First*, the Commission has shown that El-Khouri has violated the securities laws—and thus the Commission has actually succeeded on the merits of its claims—for the reasons set forth above.

*Second*, the likelihood of irreparable harm is satisfied by showing the likelihood of defendant's future violations. *See Chappell*, 107 F.4th at 128-29. To determine whether there is a reasonable likelihood that a defendant will commit future violations, courts generally consider: (1) the egregiousness of the conduct; (2) the isolated or recurrent nature of the infraction; (3) the degree of scienter involved; (4) the sincerity of the defendant's assurances against future violations; and (5) the defendant's recognition of the wrongful nature of his conduct. *SEC v. Cavanaugh*, 155 F.3d 129, 135 (2d Cir. 1998). These considerations all support a finding that El-Khouri is likely to violate the securities laws in the future. El-Khouri's violations were egregious, recurring, and involved a high degree of scienter. His insider trading was neither an accident nor an isolated occurrence—he traded in front of six different transactions in eight months. Given his refusal to participate in these proceedings, El-Khouri provides no assurances to the Court that he will not now or in the future violate the federal securities laws. *See, e.g., SEC v. One or More Unknown Traders in the Common Stock of Certain Issuers*, No. 08-cv-1402, 2009 WL 3233110, at *5 (E.D.N.Y. 2009) ("[W]here, as here, a party has failed to appear, that party fails to recognize his wrongdoing and provide assurances against further violations.") (internal quotations omitted).

The remaining two *Winter* factors (balancing the equities and consideration of the public interest) are easily met here. A permanent injunction "simply requires [El-Khouri] not violate the securities laws, which he has no right to do in the first place." *SEC v. Berrettini*, 218 F. Supp. 3d 754, 765 (N.D. Ill. 2016). The public interest in enforcing the anti-fraud provisions of the Exchange Act, in the context of the rampant insider trading here, strongly favors enjoining El-Khouri. *See, e.g., SEC v. Suman*, 684 F. Supp. 2d 378, 391-92 (S.D.N.Y. 2010) (imposing permanent injunction against defendants found liable for insider trading where "[t]he boldness of

Defendants' violation of the securities laws warrant[ed] a meaningful remedy"); *SEC v. Freeman*, 290 F. Supp. 2d 401, 406 (S.D.N.Y. 2003) (granting permanent injunction where defendant used inside information to trade securities on eight occasions over two years); *see also Chappell*, 107 F.4th at 139 ("As a practical matter, if a plaintiff demonstrates both actual success on the merits and irreparable injury, it almost always will be the case that the public interest will favor the plaintiff.") (internal quotations omitted).

**B. The Court Should Order El-Khouri to Disgorge His Ill-Gotten Trading Profits Plus Prejudgment Interest.**

Under Sections 21(d)(5) and 21(d)(7) of the Exchange Act, federal district courts have authority to order disgorgement in Commission enforcement actions. 15 U.S.C. § 78u(d)(5),(7). Disgorgement "need only be a reasonable approximation of profits causally connected to the violation." *SEC v. First Jersey Secs., Inc.*, 101 F.3d 1450, 1475 (2d Cir. 1996) (internal quotations omitted); *see also SEC v. Platforms Wireless Int'l Corp.*, 617 F.3d 1072, 1096 (9th Cir. 2010). Courts have discretion to add prejudgment interest to a defendant's disgorgement amount to prevent the defendant from benefitting from the interest-free use of his or her ill-gotten gains. *First Jersey*, 101 F.3d at 1475. The rate established by the Internal Revenue Service for tax underpayment is considered an appropriate rate for prejudgment interest. *See, e.g.*, *First Jersey Sec.*, 101 F.3d at 1474; *Platforms Wireless Int'l*, 617 F.3d at 1099. Disgorgement is appropriate here because El-Khouri's trading profits were ill-gotten gains subject to disgorgement with prejudgment interest. *See generally SEC v. iFresh, Inc.*, No. 22-cv-3200, 2024 WL 416709, at *3 (E.D.N.Y. Feb. 5, 2024) (concluding that the Commission can sustain its burden of showing a reasonable approximation of ill-gotten gains without establishing losses to any specific victims) (citing *SEC v. Govil*, 86 F.4th 89, 104 (2d Cir. 2023)). Here, market participants trading contemporaneously with El-Khouri were made worse off by his

profitable insider trading and it is, therefore, appropriate to order disgorgement. *See SEC v. Airborne Wireless Network*, No. 21 Civ. 01772, 2024 WL 4891899, at *8 (S.D.N.Y. Nov. 26, 2024) ("[The] Second Circuit ruled, in *SEC v. O'Brien*, 2024 WL 2813722, at *2 (2d Cir. Jun. 3, 2024), that trading losses caused by deceptive and manipulative conduct satisfy the [*Govil*] pecuniary harm requirement.").

A court may award disgorgement and prejudgment interest on a default motion without holding an evidentiary hearing, where the record is sufficient to establish the appropriate amount to be disgorged. *United States v. Di Mucci*, 879 F.2d 1488, 1497 (7th Cir. 1989); *One or More Unknown Traders*, 2009 WL 3233110, at *6 (SEC meets burden by submitting "affidavits or documentary evidence supporting its approximation."). The accompanying declaration of John Rymas shows that El-Khouri received ill-gotten gains of approximately $2,372,229 from the insider trading described above. *See* Rymas Decl. ¶9. Accordingly, the Court should order El-Khouri to disgorge that amount together with prejudgment interest thereon in the amount of $587,452. *See* Rymas Decl. ¶10.

## C. The Court Should Impose a Meaningful Civil Penalty to Penalize El-Khouri and Deter Others.

Section 21A of the Exchange Act authorizes the Court to impose a civil monetary penalty against a person who has engaged in insider trading. *See* 15 U.S.C. § 78u-1. The amount of the penalty may be up to three times the profit gained (or loss avoided) from the unlawful trading and shall be determined by the court "in light of the facts and circumstances." 15 U.S.C. § 78u-1(a)(2). Congress has "articulated a strong public policy in favor of the assessment of civil penalties in insider-trading cases." *SEC v. Gunn*, No. 08-cv-1013, 2010 WL 3359465, at *9 (N.D. Tex. Aug. 25, 2010). "Disgorgement alone is an insufficient remedy, since there is little deterrent in a rule that allows a violator to keep the profits if he is not detected, and requires only

a return of ill-gotten gains if he is caught." *Id.* (internal quotations omitted). Congress sought to make insider trading "a money-losing proposition" and show "all who would consider it … that if you get caught … you are going to pay severely in monetary terms." *SEC v. Rajaratnam*, 822 F. Supp. 2d 432, 434 (S.D.N.Y. 2011) (internal quotations omitted), *aff'd*, 918 F.3d 36 (2d Cir. 2019).

In determining the appropriate civil penalty for insider trading, courts have considered a number of factors, including: "(1) the egregiousness of the defendant's conduct; (2) the degree of the defendant's scienter; (3) whether the defendant's conduct created substantial losses or the risk of substantial losses to other persons; (4) whether the defendant's conduct was isolated or recurrent; and (5) whether the penalty should be reduced due to the defendant's demonstrated current and future financial condition." *Rajaratnam*, 822 F. Supp. 2d at 433 (quoting *SEC v. Haligiannis,* 470 F.Supp.2d 373, 386 (S.D.N.Y.2007)). This is not "an exhaustive list." *Rajaratnam*, 918 F.3d at 45. Other factors, such as a defendant's failure to accept responsibility for his wrongdoing, have also been considered. *See, e.g., SEC v. Lipson*, 278 F.3d 656, 664 (7th Cir. 2002) (upholding imposition of maximum civil penalty in insider trading case and explaining that "acceptance of responsibility for illegal conduct is a routine and unexceptional feature even of criminal, let alone civil, punishment").

Numerous factors weigh in favor of a substantial penalty here, including El-Khouri's high degree of scienter in committing the insider trading violations at issue as well as his lack of contrition. In less than one year, El-Khouri obtained sensitive and confidential information about at least six corporate mergers and acquisitions involving publicly-traded U.S. companies, resulting in approximately $2,372,229 in illicit trading profits. This was by no means a one-time mistake or lapse in judgment. El-Khouri's conduct was egregious and repeated, and there are no

factors mitigating his securities law violations. For both individual and general deterrence purposes, a substantial penalty is warranted against a defendant who generated millions in profits through serial insider trading in U.S. issuers.

This Court has broad discretion in determining the amount of the civil penalty. "Multipliers of 1.5, 2, or even 3 times the amount of the ill-begotten gains can be imposed." *Berrettini*, 218 F. Supp. 3d at 764; *see also Drucker v. SEC*, 346 Fed. Appx. 663, 666 (2d Cir. 2009) (affirming district court's imposition of civil penalty amounting to twice the total disgorgement amount); *SEC v. Morano,* No. 18-cv-00386, 2019 WL 1440262, at *3 (D. Or. Apr. 1, 2019) (imposing a two-time penalty on a corporate insider for trading around a single merger announcement); *SEC v. Melvin,* No. 12-cv-2984, 2017 WL 11696403, at *1 (N.D. Ga. June 22, 2017) (ordering, in a case involving "an isolated incident" of insider trading, the defendant to disgorge his trading profits plus pay a penalty equal to twice those profits). The Court should impose a penalty in the amount of $4,744,458, which is approximately two times the profits gained as a result of El-Khouri's unlawful trading, to properly sanction him and to send a sobering message to other would-be insider traders. Knowing, willing, and recurrent participation in a lucrative insider trading network should have substantial consequences under the federal securities laws. Imposing a two-times penalty against El-Khouri is appropriate under the circumstances here and will ensure that, as Congress intended, his insider trading turns out to be a money losing proposition.

## <u>CONCLUSION</u>

For the reasons stated above, the Court should find El-Khouri liable on the Fifth and Sixth Claims for Relief in the Commission's Amended Complaint, and in addition to enjoining El-Khouri, the remedies imposed should include disgorgement with pre-judgment interest and a civil penalty. The Commission hereby requests that the Court enter a judgment against El-Khouri in conformity with the attached proposed judgment.

Dated: August 12, 2025                    Respectfully submitted,

                                          On behalf of the Commission,

                                          <u>/s Rua M. Kelly</u>
                                          Rua M. Kelly
                                          Michael D. Foster
                                          Assunta Vivolo
                                          Securities and Exchange Commission
                                          Boston Regional Office
                                          33 Arch Street, 24th Floor
                                          Boston, MA  02110
                                          (617)-573-8941 (Kelly direct)
                                          Email:  kellyru@sec.gov